Filed 3/17/26  Stiver v. Community Hospital of the Monterey Peninsula CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JARED STIVER, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA et al., <br><br> Defendants and Appellants. | H051653 <br> (Monterey County <br> Super. Ct. No. 21CV003771) |
| JARED STIVER, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA et al., <br><br> Defendants and Appellants. | H051855 |

Jared Stiver sued his former employer, Community Hospital of Monterey Peninsula (CHOMP), and its parent company, Montage Health (Montage) (together, defendants), for whistleblower retaliation, breach of

contract, and wrongful termination in violation of public policy. A jury found in favor of Stiver, awarded damages as to CHOMP and Montage, and found Montage (but not CHOMP) liable for punitive damages. After a bench trial, the trial court found defendants liable for violation of California's healthcare whistleblower statute.

The trial court denied defendants' separate motions for judgment notwithstanding the verdict (JNOV) but partially granted Montage's motion for new trial because the jury was not instructed on Stiver's theory of employer liability as to Montage. The court ordered a new trial on the limited issue of Stiver's employment relationship with Montage and/or CHOMP, and Montage's resulting liability, if any.

Defendants and Stiver now appeal. Defendants challenge the judgment against Montage on multiple grounds. They contend that Stiver forfeited his employer liability claim as to Montage by failing to propose jury instructions on that issue. They further contend there is insufficient evidence to support the jury verdicts against Montage, the jury's finding of punitive liability, or the trial court's healthcare whistleblower retaliation finding. Defendants also assert that Montage is entitled to a new trial on liability due to prejudicial evidentiary errors. Defendants in their appeal do not challenge the judgment or new trial order as to CHOMP.

In his cross-appeal, Stiver contends the trial court erred in granting a partial new trial because the jury was properly instructed on employer liability as to Montage, and, alternatively, any instructional error on Montage's liability was harmless. Stiver also does not challenge the new trial order as to CHOMP.

For the reasons set forth herein, we reject the parties' contentions of error. We affirm the trial court's orders denying Montage's JNOV motion and

2

partially granting a new trial on the limited issue of Montage's liability as an employer or joint employer of Stiver. Consequently, we dismiss Montage's protective appeal from the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

*A. Stiver's Employment*

CHOMP is a nonprofit hospital in Monterey County. Montage is the parent company of CHOMP. Montage oversees CHOMP, CHOMP's Tyler Heart Institute, and other medical facilities on the Monterey Peninsula. Stiver is a "cardiac technolog[ist]."

In 2007, CHOMP hired Stiver as a cardiology supervisor at the Tyler Heart Institute. Stiver's position was 80 percent management and 20 percent clinical, during which time he worked in the operating room during heart surgeries. Stiver supervised approximately 30 individuals, including ultrasound technologists, nurses, and administrative assistants.

Over the next 10 years, Stiver received positive performance evaluations and was given additional duties and oversight of other programs in the Tyler Heart Institute. He twice assumed interim assistant director duties for the Tyler Heart Institute's catheterization laboratory, initially in 2012, and again in late 2017 through early 2018.

While serving as interim assistant director in October 2017, Stiver discovered irregularities related to the tracking and billing of "trunk stock" (devices received directly from medical device company representatives).

---

[1] The factual background is drawn from the trial record. "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent.'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2.) We describe conflicting evidence where relevant to each side's contentions regarding the claims in the appeal.

This discovery prompted Stiver and others to review the coding procedures for medical billing, which they discovered "needed to be redone" because of incorrect billing and charging. Stiver reported both issues to Deborah Sober, Stiver's supervisor and director of the Tyler Heart Institute. Sober formed a committee to address the coding issue.

Stiver reported patient care issues in early 2018 involving a newer physician in the catheterization laboratory whose procedures had a significantly higher complication rate than that of other physicians. The response Stiver received from Sober when he reported his concerns "wasn't the response [he] expected" and essentially "told [him] to get in line and support the company doctor."

Shortly after, in February 2018, Sober informed Stiver that due to the critical care nature of work in the catheterization laboratory, management had decided that Tyler Heart Institute directors should be registered nurses. Stiver, who did not have a nursing degree, was removed from the interim assistant director position, though the role remained vacant for some time. Sober also informed Stiver that he would not be considered for a possible director of operations position. Stiver returned to his prior role in cardiology services.

In April 2018, Sober was promoted to another position, and CHOMP hired Deborah Rusert as the new Tyler Heart Institute director. Operations deteriorated during Rusert's tenure, which ended in November or December 2019. Stiver and others voiced concerns about Rusert's management style. In September 2018, in a detailed e-mail to Rusert (copying Sober and then-Montage vice president Terril Lowe), Stiver reported ongoing issues in the department. Within a few days, Stiver was asked to attend a meeting with Rusert and CHOMP's chief human resources officer, Greg Smorzewski.

Shortly before the meeting, Stiver received his first negative performance review from Rusert. Stiver met with Rusert and Smorzewski, who (according to Stiver) harshly criticized Stiver's job performance.

Fearful that his job was in jeopardy, Stiver agreed in October 2018 to step down from his management role to the position of cardiac and vascular ultrasound technologist, taking a substantial reduction in base pay.

Following Stiver's change in position, Lowe congratulated Rusert and Sober in an e-mail exchange (on which Stiver was not copied) on a "[v]ery good outcome" and "good example of CHOMP culture at work." Lowe emphasized that, going forward, "we all need to do everything possible to continue the face saving story for Jared. He made this choice – it was totally his idea. And how great that patients will get more of the benefit of his clinical expertise while other folks do that less important but sadly necessary, pesky management stuff. Yeah for Jared!!! . . . Not in a non-credible way of course, but as proactively as gracefully [sic] possible." Lowe also directed "that we get that Assist. Director role posted and filled chop chop."

In April 2019, Stiver and several others met with Sober, who had been promoted to chief nursing officer and Montage vice president, and voiced concerns about the status of the department. Stiver also spoke to Sober about his negative 2018 performance evaluation. Sober directed Rusert to redo the evaluation with Stiver's input. Stiver's next performance review in 2019 was very good.

In July 2019, Stiver e-mailed Smorzewski (copying Jeri Gilbert, then-assistant director of human resources) to ask about workplace policies to protect employees from retaliation "based on reported issues of patient care and billing fraud" and whether protections would be implemented. Smorzewski responded that "[it] might be better to talk in person because" he

5

was "not understanding what [Stiver] [was] asking in terms of protections." He added, "The protection is that we do not allow retaliation in the workplace and if it occurs we will hold the offending party accountable."

In September 2019, Stiver met with Sober and Smorzewski and expressed his desire to return to his prior supervisory role. Sober and Smorzewski told Stiver they "were open to discussing options," apart from assistant director, and created a new "lead structural heart tech" position. The new role increased his compensation, though not to the level it had been before. CHOMP terminated Rusert in late 2019 because of dissatisfaction with her supervision of the Tyler Heart Institute.

Stiver continued to report problems he discovered with billing procedures. CHOMP hired a third party auditor to audit the billing practice. In April 2020, Marsha Hurst became the director of the Tyler Heart Institute but left in October 2021. Hurst restricted technologists—including Stiver—from performing transesophageal echocardiograms (ultrasound of the heart through a probe placed in the esophagus). Stiver considered performing the procedure "an integral part" of his job. Hurst's decision caused confusion in the department and was later reversed by Montage's vice president of medical affairs.

Stiver continued to raise questions about these issues and the status of his position at CHOMP. In 2020, Smorzewski informed Stiver that CHOMP had hired an independent investigator to examine Stiver's complaints.

Stiver understood the investigation was to determine whether the trajectory his career had taken after he reported billing and patient care issues within the department, including being removed from the interim assistant director position and barred from performing transesophageal echocardiograms, constituted unlawful retaliation. Stiver was not aware of

6

allegations of bullying or complaints against him by coworkers. He met with the investigator two or three times and exchanged multiple texts and e-mails. Stiver was not informed of the results of the investigation, which took three to four months. The investigation concluded that Stiver's retaliation claims were unsubstantiated but noted two instances in which the investigator found Sober lacked credibility.

In December 2020, Stiver notified chief compliance officer and Montage vice president Tim Nylen that Stiver had discovered another billing issue related to patient care. In early 2021, Stiver was told there was no need for him to attend department meetings, though he was later brought back into some meetings. Stiver was assigned more physically demanding assignments than his peers, which required him to maneuver heavy, portable machinery around the hospital, causing damage to his knees.

In June 2021, Stiver reported that a recurrent issue related to the scheduling of technologists in the operating room was creating patient care problems and suggested the department work on identifying a solution. Stiver continued to express the concern that his exclusion from meetings and differential treatment (as compared to the other technologists) was retaliatory.

Stiver questioned management's failure to address an incident in which a coworker had pulled Stiver's paystub from the office shredder, pasted it together, and showed it to others in the department. In September 2021, Stiver reported to management that Tyler Heart Institute staff were not following protocol for a procedure.

In July and August 2021, Smorzewski received complaints about Stiver from three Tyler Heart Institute employees (including from the employee who had removed Stiver's paystub from the shredder). These complaints stated

Stiver was " 'toxic' " and was bullying and intimidating other workers. Stiver's direct supervisor reported that his negative attitude was agitating the team. A former employee who was considering returning to CHOMP also expressed concerns about working with Stiver.

In October 2021, Dr. Steven Packer, Montage's chief executive officer, learned that a local news agency had received an anonymous e-mail alleging "serious mismanagement of CHOMP" and listing departures of doctors and staff from the cardiology department. Packer shared the e-mail with Sober, who responded, "This smells like Jared."

In November 2021, Smorzewski and Jeri Gilbert, then-assistant director of human resources, informed Stiver that they had received complaints about him that they needed to investigate. Stiver was suspended without pay. The investigatory suspension notice informed Stiver that "[h]uman [r]esources has received complaints from your peers about your conduct in the workplace" and that he would be interviewed and given the opportunity to provide relevant information or witnesses.

Gilbert prepared an interview template, which included an instruction to the interviewer to "[s]hare specific reported offensive behaviors" with the witness being interviewed and ask if they "recognize the described behavior." Gilbert and Smorzewski interviewed Stiver and CHOMP staff members who worked with Stiver. At the conclusion of the investigation, Smorzewski and Gilbert determined that Stiver had created a hostile working environment for other CHOMP employees, had not shown any willingness to change, and that his misconduct was egregious.

As required by CHOMP procedures, Smorzewski and Gilbert consulted with a third party manager (from a different department) who reviewed the allegations and investigation results and agreed that grounds for termination

had been established.  Sober, as chief nursing officer and Montage vice president, provided "final approval."  On November 16, 2021, Smorzewski and Gilbert met with Stiver and terminated his employment.

*B. Stiver's Whistleblower Retaliation and Wrongful Termination Action*

In December 2021, Stiver sued CHOMP and Montage, alleging whistleblower retaliation and related claims.  The complaint asserted 10 causes of action, which were identical against CHOMP and Montage.  Defendants generally denied the allegations.  In its answer, Montage asserted as affirmative defenses that it "did not employ [Stiver] for any purpose or in any capacity," and Stiver had not pleaded and could not plead facts sufficient to establish a theory of alter ego liability.

The trial court subsequently granted in part a motion for summary adjudication brought by defendants on the ground that Stiver could not prove several of his claims and dismissed with prejudice the third, fourth, fifth, and sixth causes of action.  Following the partial grant of summary adjudication, the following causes of action remained: violation of Labor Code section 1102.5 (whistleblower retaliation) (first cause of action); breach of contract (second cause of action); violation of Health and Safety Code section 1278.5 (healthcare whistleblower retaliation) (seventh cause of action); wrongful termination in violation of public policy (eighth cause of action); unfair competition in violation of Business and Professions Code section 17200 et seq. (ninth cause of action); and declaratory relief (10th cause of action).

*C. Jury Trial*

The case proceeded to a bifurcated jury trial on Stiver's causes of action for breach of contract, wrongful termination in violation of public policy, and whistleblower retaliation.  Both sides filed motions in limine and proposed

9

jury instructions.  The jury heard evidence, including testimony from Stiver, Sober, Gilbert, and Smorzewski, over several days.

        1. <u>Motion for Nonsuit</u>

On the first day of trial, the jury was instructed that Stiver claimed Montage and CHOMP had engaged in "unlawful employment retaliation and wrongful termination of his employment."  The jury was further instructed to "decide the case against each defendant separately as if it were a separate lawsuit.  Each is entitled to separate consideration of that defendant's own defenses."  In opening statements, Stiver argued that CHOMP and Montage "are the same," share the "same leadership" and board of trustees, and are "essentially, . . . the same medical group."  Defendants countered in their opening statement that "Montage has nothing to do with this lawsuit" because Stiver "was employed by CHOMP and not Montage, and Montage doesn't belong here."

During proceedings outside the presence of the jury, Stiver's counsel reiterated to the trial court that Stiver was pursuing a "joint employer" theory against Montage and asserted Stiver intended to establish "the common four elements that make a parent liable for a subsidiary."

At the close of Stiver's case in chief, Montage moved for nonsuit. Montage argued there was no evidence that it had employed Stiver directly, overseen Stiver's day-to-day duties (as is required to find a joint employment relationship), or been an integrated enterprise with or alter ego of CHOMP. Stiver opposed the nonsuit motion.  He argued the evidence construed in his favor (as required for nonsuit) was sufficient to support the elements of parent liability under the integrated enterprise test.

Outside the presence of the jury, the trial court announced its tentative decision to deny Montage's motion for nonsuit.  The court explained that,

although the evidence relating Montage to Stiver's employment and termination was "rather tenuous," there was enough to allow the jury to decide the liability question regarding Montage. The court observed it had seen "very little evidence . . . about Montage in this matter" and asked why Stiver "need[ed]" Montage in the case. The parties agreed to discuss a possible stipulation to dismiss Montage, subject to assurances regarding CHOMP's ability to cover any potential liability. The court denied Montage's motion for nonsuit on liability, subject to a meet and confer regarding the proposed stipulated dismissal.

The parties were unable to agree on a stipulation to dismiss Montage and debated the appropriate wording of an instruction as to Montage's liability. Ultimately, the trial court did not give any instructions on either integrated enterprise or alter ego/single enterprise liability.[2]

In closing argument, Stiver's counsel argued that Stiver had shown there was "an employment relationship" between Stiver and Montage as well as between Stiver and CHOMP, including based on "[c]ommon management," "[c]ommon control over the employees," and actions of "Montage human resources." Defendants' closing argument emphasized that the jury would receive separate instructions for CHOMP and Montage, arguing "[t]here's not one bit of evidence that showed Montage employed [Stiver]."

2. Jury Instructions

The jury received separate instructions for each defendant on liability and damages. With respect to Montage, the instructions on Stiver's breach of employment contract claim included as an element that Stiver must prove, based on written or oral contract provisions or on the conduct of the parties,

---

[2] We discuss the details of the parties' proposed instructions and the trial court's treatment of this issue in more detail *post* (pt. II.B.1.a.).

11

that he and Montage had "entered into an employment relationship." The instructions on Stiver's wrongful discharge and whistleblower protection (Lab. Code, § 1102.5) claims further included as an element that Stiver must prove Montage "was Jared Stiver's employer."

The jury was not instructed on the definition of an employer or multiple employers and was not given any of the parties' proposed special instructions on integrated enterprise or alter ego/single enterprise liability.

### 3. Verdicts and Damages

The jury found both CHOMP and Montage liable on the three causes of action for breach of employment contract, wrongful termination in violation of public policy, and violation of Labor Code section 1102.5. Regarding Montage's employment of Stiver, the jury returned special verdicts finding as follows: (1) Stiver and Montage "entered into an employment relationship" and Montage discharged Stiver without good cause, harming him; (2) Stiver was employed by Montage for purposes of the wrongful discharge cause of action; and (3) Stiver was employed by Montage for purposes of the whistleblower protection cause of action.

Against CHOMP, the jury awarded $475,000 in noneconomic damages. Against Montage, the jury awarded $475,000 in noneconomic damages and $4 million in economic damages. The jury further found that Montage—but not CHOMP—acted with malice, oppression, or fraud to support an award of punitive damages.

The jury's finding of malice, oppression, or fraud with respect to Montage triggered the second phase of trial on punitive damages. The jury heard evidence on Montage's financial net worth and ownership structure as the parent company of CHOMP and several other companies. The jury awarded $5 million in punitive damages against Montage.

12

*D. Bench Trial*

Following the jury verdicts, Stiver dismissed his ninth and tenth causes of action for unfair competition and declaratory relief. The parties briefed the law and procedure for adjudicating the remaining seventh cause of action for violation of the healthcare whistleblower statute (Health & Saf. Code, §1278.5).

At the hearing, the trial court observed that it was somewhat guided by the jury's "thumping verdict" and by the California Supreme Court's decision in *Shaw v. Superior Court* (2017) 2 Cal.5th 983. The court reasoned it had to "give effect to the jury's verdict on common issues of fact." The court also stated it was deciding the seventh cause of action "independently as a trier of fact based on a preponderance of the evidence."

After reviewing the evidence and hearing argument, the trial court found in favor of Stiver on the seventh cause of action. The court explained that the evidence showed a "significant intertwining" of the billing issues and patient care concerns. It found that even if the "trunk stock" billing issue reported by Stiver did not come within the scope of the statute as "relating to the care, services, and conditions of a facility" (Health & Saf. Code, §1278.5, subd. (a)), Stiver raised other issues related to patient care that were protected activity and not isolated from the events leading to Stiver's termination. The court noted that while it did not "completely discredit the complaints made by Mr. Stiver's coworkers, . . . the alacrity of defendant's response to immediately terminate based on what appeared . . . to be relatively mild complaints is circumstantial evidence of a causal connection" between Stiver's protected activity and the adverse employment action.

13

Applying the *McDonnell Douglas*[3] framework applicable to a prima facie showing of causal connection, the court found that there was "very strong circumstantial evidence that Jared Stiver was retaliated against for his complaints."

Regarding Montage's liability, the trial court noted the issue "may be a proper question to look at again after the judgment is entered on post-trial motions." Nevertheless, the court concluded that Montage "does appear to be an integrated enterprise with CHOMP." It decided Montage was a health care facility within the meaning of the statute and adjudged Montage and CHOMP liable on the seventh cause of action for healthcare whistleblower retaliation.

*E. Judgment*

The trial court entered judgment in favor of Stiver and against Montage and CHOMP. It found the jury's award of $475,000 in noneconomic damages as to each defendant duplicative, eliminated the duplication, and awarded that amount in noneconomic damages solely against CHOMP, for a total award against the defendants of $9.475 million.

*F. Motions for Judgment Notwithstanding the Verdict, or New Trial*

CHOMP and Montage filed motions for JNOV, arguing in each instance that there was no substantial evidence to support the jury's verdicts.

Concurrently, both defendants filed motions for new trial.

The trial court held a hearing on the four motions, which it took under submission after inviting supplemental briefing on Montage's motion for new trial.

---

[3] The United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 established a burden-shifting framework for trying claims of intentional employment discrimination cases based on circumstantial evidence.

14

The trial court issued written orders after hearing on each of the four posttrial motions. The court denied both of CHOMP's motions and denied Montage's JNOV motion, "subject to further proceedings on the motion for new trial." It explained that while the issue of joint liability would need to be retried, as set forth in the ruling on Montage's new trial motion, there was substantial evidence under the deferential standard applicable to JNOV motions to support the jury's liability determination as to Montage. The court also found that clear and convincing evidence in the record "could support" a finding of malice based on Stiver's retaliatory discharge and that the punitive damages award was not excessive.

The trial court granted in part Montage's motion for new trial. It determined that the failure to instruct the jury on Stiver's theory that Montage was his employer "under an 'integrated enterprise' or similar joint liability or alter ego theory" was legal error.[4]

CHOMP and Montage appeal from the trial court's denial of their motions for JNOV and from the order granting a partial new trial. They also appeal from the judgment as a "protective cross-appeal" in the event of an appeal by Stiver from the order partially granting new trial. Stiver cross-appeals from the trial court's order granting in part Montage's motion for new trial.

We first examine the issues raised in defendants' appeal and then turn to Stiver's cross-appeal.

## II. DISCUSSION

Defendants contend that Montage is entitled to judgment as a matter of law. They assert that Stiver forfeited his claims against Montage by failing

---

[4] We describe the court's order in more detail *post* (pt. II.B.1.a.).

15

to timely request jury instructions on any of his theories of parent company liability and failed to present substantial evidence to support the judgment against Montage under any joint liability theory. Defendants also assert reversible error as to Montage in the trial court's ruling on Stiver's healthcare whistleblower claim and award of punitive damages. In the alternative, defendants contend that prejudicial evidentiary errors entitle Montage to a new trial on liability. Defendants do not challenge the trial court's partial new trial order, except to the extent it does not grant all the relief defendants sought as to Montage.

Stiver counters that substantial evidence supports the judgment based on a direct employment theory of liability as to Montage, including the award of punitive damages, and the jury was properly instructed on each of the challenged claims.

In his cross-appeal, Stiver challenges the partial grant of a new trial to Montage on several grounds, including that there was no instructional error regarding the Montage employment relationship.

Because the arguments made by both sides center on Montage's relationship with CHOMP and whether Stiver was an employee of Montage, we begin by setting forth those arguments and the principles they describe before addressing the parties' specific contentions of error.

*A. Theories of Employer Liability*

     1. <u>Parties' Arguments</u>

Defendants state that Montage and CHOMP are separate entities. They contend that Montage and CHOMP may not be treated as a single integrated or joint employer of Stiver absent findings under the four-factor integrated enterprise test, or another similar theory, such as alter ego, agency, or joint employer. Defendants assert it was Stiver's burden to

propose instructions that would allow the jury to decide Montage's liability under any of these theories. Defendants cite *Laird v. Capital Cities/ABC, Inc.* (1998) 68 Cal.App.4th 727 (*Laird*), disagreed with on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 524, *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236 (*Mathews*), and *St. Myers v. Dignity Health* (2019) 44 Cal.App.5th 301 (*St. Myers*), in support of their argument that Montage may not be held liable as the parent corporation absent specific instructions to the jury and factual findings on the controlling factors.

Stiver counters that a range of evidence at trial—particularly Montage's control over his suspension and termination—supports the jury's determination of Montage's liability under what he calls a theory of "[d]irect employment liability." He maintains that defendants themselves sought independent treatment of Montage and CHOMP (by requesting separate jury instructions and verdict forms), proffered no evidence of a parent-subsidiary relationship, and "never wanted the jury to consider whether Montage may be liable for CHOMP's conduct."

Stiver argues that instructing the jury on an integrated enterprise was unnecessary because the jury decided the employment question as part of the general liability instructions on each cause of action. He maintains the trial court's subsequent finding (at the bench trial on the seventh cause of action) that the entities were an integrated enterprise merely provides a secondary basis for Montage's liability as an employer. Stiver cites *Guerrero v. Superior Court* (2013) 213 Cal.App.4th 912 (*Guerrero*) and *Medina v. Equilon Enterprises, LLC* (2021) 68 Cal.App.5th 868 (*Medina*) in support of his argument that the jury was adequately instructed on the issue of Montage's

17

direct liability as an employer. Stiver reiterates these arguments in his cross-appeal.

2. Analysis

The theories espoused by each side derive from different legal frameworks and utilize distinct legal tests. Stiver's "direct employer" liability theory arises from case law addressing the definitions of "to employ" and "employer" in wage claims brought under state and/or federal law. Citing *Guerrero* and *Medina*, Stiver argues the "power to fire or to prevent Stiver from working" are proof of employer status.

In *Guerrero*, the Court of Appeal reversed a trial court order sustaining a demurrer on causes of action for violation of federal and state wage and hour claims brought by a county in-home support services worker against the county and county support services agency. The plaintiff had alleged that the county agencies were her " 'employers' or 'joint employers' " together with the in-home services recipient. (*Guerrero*, *supra*, 213 Cal.App.4th at p. 918.) In *Medina*, the Court of Appeal reversed a summary judgment in favor of a gas station operator and Shell Oil Company subsidiary on gas station worker claims of misclassification and failure to pay overtime wages after concluding the facts pertaining to control over the plaintiff's wages, working conditions, and permission to work at Shell's stations, was "enough to make Shell" a joint employer. (*Medina*, *supra*, 68 Cal.App.5th at p. 871.)

The *Medina* and *Guerrero* decisions applied the employer definitions articulated by the California Supreme Court in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*), in which the high court considered how to define the "employment relationship" and who may be liable as an "employer[]" in state wage and hour actions under Labor Code section 1194. (*Martinez*, at p. 51; see also *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 935

18

(*Dynamex*) [noting *Martinez* "address[ed] the meaning of the terms 'employ' and 'employer' as used in California wage orders"].)  The *Martinez* court held that the employment relationship (including joint employer status) in actions under Labor Code section 1194 is controlled by the Industrial Welfare Commission (IWC)'s wage orders.  (*Martinez*, at p. 66; see *Medina*, *supra*, 68 Cal.App.5th at p. 874.)  After an extensive examination of the IWC's wage order definitions and scope of authority, our Supreme Court concluded that the phrase "[t]o employ" incorporates three alternatives:  "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship."  (*Martinez*, at p. 64.)

There is nothing in the *Martinez* decision to suggest that the employment relationship as defined by the IWC wage orders and construed by the high court in *Martinez* applies outside of Labor Code section 1194 and wage order cases.  In *Dynamex*, our high court reviewed the "proper scope of the *Martinez* decision" (*Dynamex*, *supra*, 4 Cal.5th at p. 935) to decide whether workers should be classified as employees or as independent contractors for purposes of California wage orders.  The Supreme Court stressed the limited nature of its inquiry.  It stated, "[t]he issue in this case relates to the resolution of the employee or independent contractor question *in one specific context* . . . whether workers should be classified as employees or as independent contractors *for purposes of California wage orders*."  (*Id*. at p. 913, italics added.)  The *Dynamex* decision applied the definitions articulated in *Martinez* to the wage and hour context, in contrast to the common law definition of employer.  (*Id*. at pp. 942–943; cf. *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 531 (*Ayala*) [analyzing class certification claim by "applying the common law test for employment" where

19

plaintiffs in wage and hour case had proceeded solely on a common law theory].)

This case does not involve a Labor Code section 1194 action to recover minimum wage or overtime compensation, nor a wage order under the IWC's authority. In the absence of an applicable statutory definition of "employer" or case authority to the contrary, we agree with defendants that the claims at issue are governed by the common law. (See, e.g., *Bennett v. Rancho California Water Dist.* (2019) 35 Cal.App.5th 908, 924 [concluding common law definition of employment applies to statutory whistleblower claim under Labor Code section 1102.5, where the statute does not supply a definition]; *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 500 [articulating general rule that use of the undefined term " 'employee' " in a statute typically calls for application of the common law test of employment].)

Under the common law, the standard for determining whether a common law employer-employee relationship exists is "the degree of a hirer's right to control how the end result is achieved." (*Ayala*, *supra*, 59 Cal.4th at p. 528.) Put differently, the common law looks to "the extent of the hirer's right to control the work," alongside other indicia. (*Id.* at p. 532.)

This standard differs when the hirer is not the only entity against whom liability is sought, particularly in the context of the liability of parent corporations for actions by a subsidiary direct employer. Generally, "[a]n employee who seeks to hold a parent corporation liable for the acts or omissions of its subsidiary on the theory that the two corporate entities constitute a single employer has a heavy burden to meet under both California and federal law. Corporate entities are presumed to have separate existences, and the corporate form will be disregarded only when the ends of justice require this result. [Citations.] In particular, there is a strong

20

presumption that a parent company is not the employer of its subsidiary's employees." (*Laird*, *supra*, 68 Cal.App.4th at p. 737.)

To overcome this presumption and determine the existence of an employer-employee relationship between the parent company and the plaintiff, California courts have adopted several tests derived from federal labor law cases, including the integrated enterprise test, alter ego test, and agency test. Though distinct, these theories and their tests are based upon "similar governing standards." (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 124 (*Vernon*); *St. Myers*, *supra*, 44 Cal.App.5th at p. 311.)

The parties' focal theory in this case, the integrated enterprise test, consists of four factors: "interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control." (*Laird*, *supra*, 68 Cal.App.4th at p. 737.) Among the four factors, "[c]ommon ownership or control alone is never enough to establish single employer liability, and courts 'often deem centralized control of labor relations the most important' factor." (*Mathews*, *supra*, 43 Cal.App.5th at p. 248.) Courts ask " ' "[w]hat entity made the final decisions regarding [the] employment matters" ' " at issue. (*Laird*, at p. 738; *Mathews*, at p. 248.)

This inquiry is intensely factual. The alter ego, agency, and joint employer theories evoke similar language of control by the parent company of the subsidiary employee to justify imposition of liability. " 'The common and prevailing principle espoused in all of the tests directs us to consider the "totality of circumstances" that reflect upon the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties.' " (*St. Myers*, *supra*, 44 Cal.App.5th at p. 311.) Under each of the relevant tests, "the court must analyze 'myriad facts surrounding the employment

21

relationship in question.' . . . '[T]he precise contours of an employment relationship can only be established by a careful factual inquiry.' " (*Ibid*.)

Given that this case does not involve minimum wage or overtime claims, we conclude that *Martinez* and cases applying the IWC's wage order definitions to determine the employer relationship are inapposite. We reject Stiver's contention that his employment relationship with Montage is governed by cases involving "direct employer" liability theory. Moreover, it is apparent from our review of the trial record that the discussions of counsel and the trial court, and the special instructions initially submitted by both sides, were intended to address the factors of joint employer liability. Despite these discussions, the jury instructions did not articulate a clear definition of the employer-employee relationship, giving rise to the issues we confront in these appeals.

### B. Defendants' Appeal

Defendants assert that Montage is entitled to judgment as a matter of law on the following grounds: (1) Stiver's failure to timely propose jury instructions on his theory of liability against Montage; (2) insufficient evidence to support the judgment against Montage under the integrated enterprise or related theory of liability; and (3) insufficient evidence to support the conclusion that Montage was a healthcare facility and Stiver's employer for purposes of the healthcare whistleblower claim. Defendants further challenge certain evidentiary rulings and contend there is insufficient evidence to support the award of punitive damages.

### 1. Failure to Propose Integrated Employer Instruction

Defendants contend that a plaintiff's failure to propose comprehensive instructions on the theory of liability in a civil case forfeits the right to recover on that theory. They argue that Stiver forfeited his claims against

Montage by failing to timely request jury instructions under any theory of corporate liability. Stiver counters that direct employer liability "was the primary theory of liability against Montage." He contends it is Montage who forfeited any instruction on joint employer liability by avoiding the subject of Montage's parent-subsidiary relationship in its pleadings and trial briefings and insisting on separate instructions for Montage and CHOMP, which it received.

### a. Additional Background

As described in the procedural background *ante* (pts. I.C.1. & 2.), Stiver sought to present to the jury a theory of joint liability—arguing CHOMP and Montage were "essentially, . . . the same medical group"—while defendants strove to differentiate CHOMP, as Stiver's employer, from Montage, asserting Montage did not belong in the case.[5]

The parties proposed jury instructions consistent with their respective positions. Stiver's proposed instructions treated CHOMP and Montage as a single entity. For example, Stiver's proposed instruction on breach of contract (CACI No. 2401) stated that "Stiver claims that [CHOMP] and Montage [] breached their employment contract by firing [] Stiver" and described its elements, including that Stiver must prove that "[he] and [CHOMP] and Montage [] entered into an employment relationship." The proposed instruction did not define "employment relationship" but stated that an employment contract or a provision in an employment contract "may be written or oral/partly written and partly oral/created by the conduct of the

---

[5] This was consistent with defendants' position from the outset of the case. Defendants asserted as a first affirmative defense to the complaint that Montage "did not employ [Stiver] for any purpose or in any capacity" and contended that Stiver could not plead facts sufficient to establish a theory of alter ego liability.

parties." Stiver's proposed instruction on wrongful discharge in violation of public policy (CACI No. 2430) stated that Stiver must prove, among other elements, that he "was employed by [CHOMP] or Montage" and that "[CHOMP] or Montage [] discharged" him.

Defendants proposed similar instructions on liability (and ultimately agreed to plaintiffs' proposal of using the CACI No. 2401 series) but requested separate instructions as to CHOMP and Montage for each claim. Defendants also proposed the standard "[m]ultiple [p]arties" instruction (CACI No. 103) directing the jury "to decide the case against each defendant separately as if it were a separate lawsuit."

During Stiver's case-in-chief, at a hearing on jury instructions outside the presence of the jury, defendants' counsel argued there was no evidence against Montage to support plaintiff's theory that both entities are liable. Counsel indicated defendants sought "special instructions" on parent company liability for a subsidiary's actions as something Stiver would "have to prove at this point." The next morning, defendants submitted a proposed, special instruction titled "alter ego/single enterprise liability" (capitalization omitted).[6]

---

[6] The proposed special instruction read, in part: "Stiver can establish liability against both [d]efendants if there is such a unity of interest and ownership between the corporation and its equitable owner that the separate entities of the [p]arent and the [s]ubsidiary do not in reality exist, and whether there would be injustice if the acts in question are treated as those of the [s]ubsidiary alone." The proposed special instruction further set forth factors to establish "a 'unity of interest,' " including commingling of funds and other assets of the parent and subsidiary, that the entities use the same offices and employees, and that the entities use identical directors and officers. The proposed special instruction indicated that "[n]o single factor is determinative."

In further discussions before the trial court that morning, Stiver's counsel reiterated that he was pursuing a "joint employers" theory and establishing "the common four elements that make a parent liable for a subsidiary, common ownership, common labor relation, management, et cetera." Defense counsel pointed out that Stiver had not submitted "any joint employment instruction" and emphasized defendants' position that a "separate instruction is required in order for the jury to be able to intelligently assess whether the type of liability that is being asserted here will, in fact, apply." Defendants also reiterated their request for separate instructions and separate verdict forms for Montage and CHOMP.

At the close of Stiver's case-in-chief and following Montage's motion for nonsuit, Stiver submitted his proposed special jury instruction No. 1 on integrated enterprise liability (hereafter, proposed integrated enterprise instruction). The proposed integrated enterprise instruction explained that "[a]n integrated enterprise is where two nominally separate entities actually operate as a single employer."[7]

---

[7] Citing *Laird*, *supra*, 68 Cal.App.4th 727, the proposed integrated enterprise instruction stated, in part, "Stiver has the burden of proving that [CHOMP] and Montage [] operated as an integrated enterprise. [¶] In determining whether [CHOMP] and Montage [] operated as an integrated enterprise, you must consider the following factors: [¶] 1. The interrelation of operations between the two entities, which can include evidence of common offices, payroll preparation, shared employees and shared facilities; [¶] 2. Whether the two entities share common management (common officers, directors or managers); [¶] 3. The degree to which centralized control of labor relations exists (the entity or its officers that make the final decisions regarding employment matters); and [¶] 4. Whether there is common ownership or financial control." (Fns. omitted.) The proposed instruction indicated that Stiver was not required to prove all four factors and whether "the entities share centralized control of labor relations is frequently considered the most important factor."

25

The trial court did not decide whether to give Stiver's proposed integrated enterprise instruction because the parties reported they were negotiating a stipulation to dismiss Montage from the case. The court stated it was going to "strike all the instructions concerning Montage" and would treat Stiver's proposed integrated enterprise instruction and defendants' proposed special instruction on alter ego/single enterprise liability as "withdrawn subject to the final confirmation of agreement regarding Montage."

When the parties later informed the trial court that they had been unable to agree on the proposed stipulation to dismiss Montage from the case, the court stated it would revert to the "original versions" of the instructions using "separate instructions for each defendant." Neither side renewed its request for special instructions regarding integrated enterprise or alter ego/single enterprise liability for Montage, and the court did not rule on any of the previously submitted special instructions.

Before closing arguments, Stiver submitted two new proposed special instructions Nos. 2 and 3. These proposed special instructions addressed the definition of "employer" under *Martinez*, *supra*, 49 Cal.4th 35, and instructed that multiple entities can be employers.[8] The trial court rejected the instructions as "highly untimely."

---

[8] Stiver's proposed special instruction No. 2 stated: "Employer means any person, partnership, firm, corporation, association, or other entity, who directly or indirectly, or through an agent or other person (a) exercises control over the wages, hours or working conditions of an employee; (b) suffers or permits the employee to work; or (c) engages with the employee, thereby creating a common law employment relationship."

Stiver's proposed special instruction No. 3 stated: "Multiple entities can be employers where they control different aspects of the employment relationship even if they do not directly hire, fire or supervise employees."

The jury ultimately found Montage liable on the three causes of action tried to the jury (violation of Labor Code section 1102.5 for whistleblower retaliation, breach of contract, and wrongful termination in violation of public policy) without having received specific instructions on how to determine whether Montage was a joint employer of Stiver.

### b. Legal Principles and Standard of Review

"Each party in a civil proceeding must request complete and comprehensive instructions on its theory of the case; if a party fails to do so, the court ordinarily has no duty to instruct on its own motion." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 675 (*Bullock*); accord, *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131 (*Metcalf*).) The trial court, having received an appropriate instruction, "may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) "Though it is the responsibility of counsel to propose correct instructions [citation], the failure of a trial court 'to instruct on material issues and controlling legal principles . . . may amount to reversible error.' " (*Mathews*, *supra*, 43 Cal.App.5th at p. 261; *Agarwal v. Johnson* (1979) 25 Cal.3d 932, 951, disapproved of on another ground by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 (*White*).)

Such claim of error may be forfeited, however, by the plaintiff's failure to request a jury instruction on the applicable theory of liability. (See *Metcalf*, *supra*, 42 Cal.4th at p. 1130.) Moreover, acquiescence by either party to an erroneous or incomplete instruction forfeits on appeal the claim that an instruction otherwise correct in law lacked clarity or was incomplete. (See *Hurley v. Department of Parks & Recreation* (2018) 20 Cal.App.5th 634,

27

654; *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1319 (*Holguin*).)

In addition, a defendant has no duty to propose instructions on the plaintiff's theory of the case. (*Valentine v. Kaiser Foundation Hospitals* (1961) 194 Cal.App.2d 282, 290, disapproved on another ground by *Siverson v. Weber* (1962) 57 Cal.2d 834, 839.)

We independently review a claim of instructional error as a question of law involving the determination of applicable legal principles. (*Holguin*, *supra*, 229 Cal.App.4th at p. 1319.) So, too, "the determination whether a party's actions constitute forfeiture is essentially legal in nature, and thus subject to independent review." (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 476 (*Lynch*).)

### c. Analysis

Despite clear statements of intent by Stiver's counsel throughout the trial to pursue a "joint employer" theory against Montage, Stiver's pretrial proposed instructions failed to address the factors necessary to establish a joint employer relationship. Nor did Stiver submit proposed instructions on a joint employer theory during his case-in-chief, even after Stiver's counsel asserted to the trial court that Stiver would "establish[] the common four elements" of integrated enterprise liability.

Nevertheless, Stiver did submit his proposed integrated enterprise instruction before the close of defendants' case. That the instruction—or some version of it—was not given to the jury appears to be an unintended outcome of the trial court having deemed the special instructions withdrawn (subject to final confirmation of an agreement concerning the dismissal of Montage) and neither party having re-requested the integrated enterprise instruction after the parties failed to finalize the anticipated agreement.

28

Because Stiver proposed an integrated enterprise instruction, forfeiture of any right to recover against Montage is not an appropriate remedy for Stiver's counsel's failure to re-request the proposed instruction after the trial court's decision to deem it withdrawn subject to the anticipated stipulation and failure to circle back to the previously proposed special instructions.

Defendants also assert that Code of Civil Procedure section 607a requires Stiver to have submitted his instructions to the trial court and opposing counsel on his theories " 'before the first witness was sworn.' " The statute provides that "it shall be the duty of counsel for the respective parties, before the first witness is sworn, to deliver to the judge presiding at the trial and serve upon opposing counsel, all proposed instructions to the jury covering the law as disclosed by the pleadings." (*Ibid.*)

A party's failure to comply with the timing requirement affords the trial court discretion to refuse the instruction. (See, e.g., *Jarkieh v. Badagliacco* (1946) 75 Cal.App.2d 505, 513, disapproved on another ground by *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30; *Zanon v. Moher* (1955) 136 Cal.App.2d 348, 354.) But nothing in the statutory language or related case law dictates that procedural noncompliance (e.g., belatedly submitting a proposed special instruction on a legal theory disclosed by the pleadings) automatically forfeits a party's right to recover on that theory.

To be sure, it is a plaintiff's duty to timely " ' " 'propose complete and comprehensive instructions in accordance with his theory of the [case].' " ' " (*Metcalf*, *supra*, 42 Cal.4th at p. 1131.) In a typical scenario, failing to request (or, in this case, re-request) a comprehensive instruction on the plaintiff's operative theory of liability would bar him from arguing on appeal that the court misinstructed the jury. (*Id.* at p. 1130.)

This case, however, does not present a typical scenario. Although it was Stiver's burden to request an appropriate instruction on a joint employment theory of liability, it is not Stiver who asserts error on appeal on the ground of misinstruction. Rather, defendants—who have obtained a narrowly tailored remedy to Stiver's alleged error in the form of a limited new trial on the issue of Montage's employment relationship—seek a broader remedy by arguing forfeiture of Stiver's case against Montage and entry of judgment for Montage as a matter of law.

Under these circumstances, the cases cited by defendants do not dictate forfeiture of Stiver's claims against Montage. *Westrec Marina Management, Inc. v. Jardine Ins. Brokers Orange County, Inc.* (2000) 85 Cal.App.4th 1042 (*Westrec*) involved the trial court's refusal to conduct a second phase trial on punitive damages because the plaintiffs had not requested the necessary jury instruction. (*Id*. at pp. 1045–1046.) By statute, before punitive damages may be awarded in a bifurcated trial, the plaintiff in the first phase on liability must present " 'clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.' " (*Id*. at p. 1050; Civ. Code, §§ 3294, subd. (a), 3295, subd. (d).) On appeal, the *Westrec* court affirmed. It explained that because the plaintiffs had not requested a jury instruction to decide whether there was clear and convincing evidence of oppression or malice, the trial court acted properly in refusing a trial on punitive damages. (*Westrec*, at p. 1050.)

*Westrec* is not analogous to the facts here because the plaintiffs in that case did not request and the jury was not asked to consider the issue of punitive damages or instructed on the predicate findings required to proceed to a second phase trial on punitive damages. (*Westrec*, *supra*, 85 Cal.App.4th at p. 1050.) Stiver's counsel did request a proposed special instruction on the

30

integrated enterprise theory, but it was not given due to inadvertence rather than failure to invoke a right. (Cf. *Lynch*, *supra*, 3 Cal.5th at p. 476.) More significantly, the jury heard argument and evidence from both parties concerning the relationship between Montage and CHOMP and Montage's alleged involvement in the actions against Stiver and was asked to decide (as to each substantive claim) whether Montage was an employer.

We are also not persuaded of the relevance of *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, which defendants cite for the proposition that a plaintiff who fails to propose a jury instruction on a particular theory of liability at trial cannot subsequently have a jury verdict upheld on that theory. The plaintiff in *Border* won a large jury verdict on an inverse condemnation claim. (*Id.* at p. 1546.) On appeal, the appellate court agreed with the city that the inverse condemnation verdict based on rerouted truck traffic having impaired access to the plaintiff's business park was not supported by substantial evidence. (*Id.* at pp. 1551, 1557.) The court rejected the landowner's alternative argument that the verdict could be affirmed on the theory that dust and noise from the rerouting of traffic around the plaintiff's property constituted a nuisance. (*Id.* at p. 1559.) It explained that the case was not submitted to the jury on the nuisance theory and reasoned that it could not "uphold a judgment on the basis of a legal theory which was not submitted to the jury." (*Id.* at p. 1560; see also *Pinto v. Farmers Ins. Exchange* (2021) 61 Cal.App.5th 676, 692 [reversing bad faith judgment against insurance company where special verdict failed to ask for jury findings on whether insurer had acted unreasonably].)

Unlike in *Border* and *Pinto*, the jury here *was* asked to decide the employment relationship between Montage and Stiver—albeit without adequate instruction on the requisite factors to guide their determination.

31

Stiver thus does not ask this court to affirm the jury's verdict on an alternative theory not presented to the jury.

We conclude that any legal error in the failure to completely and comprehensively instruct the jury on the relevant and controlling factors for a determination of parent company employer liability does not amount to forfeiture of Stiver's right to recover on his claims against Montage.

We also reject Stiver's argument that an instruction on integrated enterprise liability was unnecessary because, consistent with defendants' request, the trial court separately instructed the jury as to Montage's and CHOMP's liability on each cause of action.

Defendants' agreement with the plaintiff's proposed CACI sets for purposes of instructing on claims (i.e., CACI No. 2401 on breach of contract, or CACI No. 2430 on wrongful discharge) and request for separate instructions and verdict forms did not signal acquiescence to the omission of a special instruction on joint employer liability or the employment relationship. To the contrary, the record shows that defendants responded to Stiver's argument that CHOMP and Montage were jointly liable and should be viewed as "the same medical group" by (1) insisting on a multiple defendants instruction "to decide the case against each defendant separately as if it were a separate lawsuit," and (2) arguing it was Stiver's burden to prove his joint employer theory, on which he had not yet submitted any instruction.

We disagree with Stiver that the purported "direct liability" instructions on breach of contract were sufficient to establish an employment relationship between Montage and Stiver. Stiver argues that the instruction on breach of employment contract "made clear the employment relationship between Stiver and Montage could be proven by words or conduct." The instruction required Stiver to prove, as an element of the claim, that he and

Montage "entered into an employment relationship," further explaining that "[a]n employment contract or a provision in an employment contract may be written or oral, partly written and partly oral, or created by the conduct of the parties." However, case authority (including cases cited by Stiver) makes clear that determining the employment relationship—particularly where a plaintiff alleges joint employers or multiple entities operating as a single enterprise—is a fact-intensive question based on governing legal principles. Thus, it is not a simple question to be decided, in the absence of legal guideposts, solely by common experience or intuition.

Whether we look to wage cases controlled by the IWC definitions of " 'employer' " (e.g., *Guerrero, supra,* 213 Cal.App.4th at p. 918; *Martinez, supra,* 49 Cal.4th at p. 42) or employment discrimination and retaliation cases in which the employee seeks to hold more than one entity liable for the alleged unlawful conduct (e.g., *Vernon, supra,* 116 Cal.App.4th at p. 120; *St. Myers, supra,* 44 Cal.App.5th at p. 305), legal tests govern who may be held liable as an employer. The parties at trial recognized this body of case law, focusing especially on the integrated enterprise theory of liability, as evidenced by Stiver's counsel's assertion that they were "establishing the common four elements that make a parent liable for a subsidiary."

That centralized control of labor relations is " 'often deem[ed]' " " 'the most important' factor" (*Mathews, supra,* 43 Cal.App.5th at p. 248) is significant because that factor did not appear in the instructions given to the jury. (See *St. Myers, supra,* 44 Cal.App.5th at p. 311, italics added [" 'The common and prevailing principle espoused in all of the tests directs us to consider the "totality of circumstances" that reflect upon the nature of the work relationship of the parties, *with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties.*' "].)

We disagree with Stiver that *Mathews* supports the proposition that joint employer liability may be presented merely as an alternative to direct employer liability. In *Mathews*, the question on appeal was whether substantial evidence supported the jury's special verdict finding that the plaintiff's nonprofit employer, Happy Valley, was a joint employer with the larger nonprofit church corporation to which Happy Valley belonged. (*Mathews*, *supra*, 43 Cal.App.5th at pp. 241, 247.) The jury was instructed on what the court termed the "single employer doctrine" based on the four factors of the integrated enterprise test. (*Id*. at p. 254.) Substantial evidence at trial related to each of the four factors supported the jury's single employer finding. (*Id*. at pp. 251–253.) Although the integrated enterprise jury instruction in *Mathews* incorrectly failed to highlight the importance of the "centralized control of labor relations" factor, the appellate court deemed the error harmless. (*Id*. at pp. 254–255.) Given that the jury was instructed on the parties' agreed-upon joint employer theory of liability using the four-factor integrated enterprise test for parent company liability, *Mathews* is not authority for a jury finding a parent company liable to the subsidiary company's employee under a "direct employer" theory of liability.

In sum, Stiver did not forfeit his claim to hold Montage liable for its role in Stiver's alleged retaliation and wrongful termination, though he failed to ensure that the jury was given clear and comprehensive instructions on his theory of Montage's joint liability. (*Bullock*, *supra*, 159 Cal.App.4th at p. 675.) We examine the legal consequences flowing from this failure to properly instruct the jury in our analysis of the cross-appeal, *post* (pt. II.C.).

2. <u>Substantial Evidence of Joint Employer Liability</u>

Defendants contend that even if Stiver did not forfeit his claims against Montage, he failed to present substantial evidence to support the judgment

against Montage under the integrated enterprise or related theory. They assert there is no evidence that Montage employed Stiver directly (i.e., hired him or paid him) and insufficient evidence to hold Montage liable as a joint employer under the integrated enterprise test. Stiver disputes defendants' characterization of the evidence, which he maintains supports the jury's finding of direct employer liability and the trial court's finding of liability as to the seventh cause of action based on an integrated enterprise theory.

a. Additional Background

At the time of the trial, the evidence established that Montage was the parent company of CHOMP and other companies within Montage Health. Dr. Packer was the chief executive officer of "the Montage group," which included CHOMP. The two entities shared a single board of trustees and had common officers, including the chief executive officer, chief financial officer, chief nursing officer, chief human resources officer, and chief compliance officer.

The evidence also showed that the organizations shared common branding ("Montage Health") and a common Code of Ethical Conduct. The Code of Ethical Conduct states that it was designed for "all employees, managers, administrators, volunteers, and boards of trustees" across all the Montage entities and describes policies and workplace standards for ethical patient care, compliance, reporting and investigations, billing and coding, and recordkeeping. It directs employees to report any workplace or compliance concerns to Montage (providing the telephone number of the chief compliance officer, and the e-mail address of the Montage compliance department).

Trial testimony presented a blurred picture of the employment relationship between the two entities, with individual witnesses appearing at times to treat Montage and CHOMP synonymously or interchangeably.

Smorzewski was the chief human resources officer at CHOMP and Montage, having become a Montage vice president after Stiver's termination. Sober was the chief nursing officer and Stiver's supervisor for many years; in 2019 she joined the Montage executive team as a vice president. Sober testified that she was the chief nursing officer for "both" CHOMP and Montage.

As part of Montage's executive team (at the time of trial), Smorzewski and Sober attended the meetings of the Montage board of trustees as nonvoting members. Smorzewski "reported directly" to Nylen, chief compliance officer and Montage vice president during the relevant period.[9] Gilbert was the assistant director of human resources at CHOMP and Montage at the time of the events at issue, reported to Smorzewski, and later became the director of human resources.[10]

Montage medical officers exercised decisionmaking authority over certain CHOMP operations. The chief of staff of Montage was a rotating two-year position (held by various doctors during Stiver's tenure) and had

[9] Nylen was deceased at the time of trial.

[10] Gilbert testified that she was the "assistant director of human resources" in separate questions referring to CHOMP and to Montage. Gilbert also testified that she chose to work at *CHOMP* because "[w]e, at *Montage*, provide really good patient care and treat employees well." (Italics added.) In another example of imprecise references, Smorzewski testified that Nylen "was a vice president with [CHOMP] at Montage" (collapsing the two organizations). Matthew Morgan, chief financial officer of Montage, testified in the second phase trial on punitive damages that he was the chief financial officer "with Montage Health" but later stated "[a]ll [his] employment has been through [CHOMP]."

36

authority over the physicians and some operations of the Tyler Heart Institute. The chief of staff was a member of the Montage board of trustees and supervised technologist competency at the Tyler Heart Institute. Stiver spoke to then-chief of staff, Dr. Matt Fritsch, in 2019 about the billing issues he had observed. Dr. Fritsch and other department doctors also engaged Montage's vice president of medical affairs, Dr. Steven Cabrales (who worked under Dr. Packer), in response to Marsha Hurst's decision to prohibit technologists from performing transesophageal echocardiograms. Dr. Cabrales "promptly" reversed the decision, allowing Stiver to continue performing the procedure. Dr. Alexander Dubelman, a cardiac anesthesiologist at CHOMP, testified that Dr. Cabrales was with CHOMP and Montage, calling the two entities "pretty much synonymous."

On the morning of Stiver's suspension, Smorzewski informed Dr. Packer that there was going to be an investigative suspension of Stiver. Gilbert directed various department directors by e-mail that day to suspend Stiver's access "effective immediately." Gilbert also signed the investigatory suspension report informing Stiver in relevant part that "Human [r]esources has received complaints from your peers about your conduct in the workplace. [¶] As a result of the complaints, it is necessary for an investigation to be conducted." Gilbert testified that she and Smorzewski were responsible for deciding to suspend and ultimately terminate Stiver, and that Sober—who at that time was an officer of Montage—"had to give a final approval." In response to questions about Stiver's termination, Gilbert agreed that the three decision makers responsible (Gilbert, Sober, and Smorzewski) "were Montage representatives."

Smorzewski communicated at various points with Nylen, Montage vice president and chief compliance officer about Stiver. Smorzewski informed

37

Nylen about his meeting with Stiver in July 2019 to offer Stiver the "lead structural heart tech" position (following Stiver's removal from the assistant director and supervisor roles). Smorzewski also consulted with Nylen about the decision to terminate Stiver's employment.

Stiver's managers at the Tyler Heart Institute similarly consulted with and received direction from Montage vice president and chief nursing officer Lowe about managing Stiver's return to a technologist role in 2018. Lowe guided Rusert and Sober to portray Stiver's return to the technologist position with the "face saving story" that it was Stiver's choice and directed them to fill the assistant director position quickly. Lowe also indicated they would meet the following week about issues affecting technologists in the department, including "du[a]l call coverage" (having two echocardiogram technologists simultaneously on call) and "tech's role intra-op" (technologists' role in the operating room). Sober testified, regarding Stiver's prior request for a director role at Tyler Heart Institute, that she would not have been able to make him a director and would have had to propose it to Lowe, as chief nursing officer, for approval by the Montage executive committee.

b. Legal Principles and Standard of Review

We review defendants' contention that the evidence does not support the verdicts of employer liability against Montage as an appeal from the denial of the JNOV on this issue. "An 'appeal from the trial court's denial of the . . . motion for judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence to support the jury's verdict and the trial court's decision.' " (*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1320 (*Carter*).) We therefore review the trial court's denial of the motion under the substantial evidence standard. (See *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770 (*Cabral*).)

Under the substantial evidence standard, we " ' "must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his favor, and give him the benefit of all reasonable inferences in support of the original verdict." ' " (*Carter*, *supra*, 122 Cal.App.4th at p. 1320.) " 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. [Citation.] It is sufficient ' "if any reasonable trier of fact could have considered it reasonable, credible and of solid value." ' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1142 (*San Diego Unified*).) " 'Our inquiry "begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." ' " (*Ibid.*) "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted (*Bowers*).)

   c. Analysis

  We have independently reviewed the record in the light most favorable to Stiver, drawing all reasonable inferences in support of the jury's verdict. (*Carter, supra*, 122 Cal.App.4th at p. 1320.) We perceive no error in the trial court's finding that even as "[t]he evidence as to joint liability against Montage was mixed and will need to be retried, with proper instruction," substantial evidence supports judgment against Montage under an integrated enterprise theory. We agree with the court's conclusion that, "[a]ssuming a finding of joint liability on the partial retrial, . . . there [is] substantial evidence supporting the verdicts against Montage."

Our review of the evidence set out above confirms the existence of relevant evidence that a reasonable trier of fact might consider "adequate to support a conclusion" (*San Diego Unified*, *supra*, 214 Cal.App.4th at p. 1142) that Montage and CHOMP operated as an integrated enterprise for purposes of Stiver's claims against them based on the four factors of the integrated enterprise test (i.e., interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control).

Defendants concede the factors of common management and common ownership or financial control. The concession is well-taken. Common ownership is established by Montage's position as the parent company of CHOMP. (*Mathews*, *supra*, 43 Cal.App.5th at p. 251.) Chief financial officer Morgan testified that Montage "owns" CHOMP and the other subsidiary clinics and medical groups. Although Morgan stated Montage does not file a consolidated tax return, he testified regarding several years of consolidated financial statements for Montage and related companies. The trial court found that these "financial statements indicate a significant measure of financial oversight and control by Montage over CHOMP."

While the fact of common ownership or financial control, without more, is insufficient to establish an integrated enterprise (*Laird*, *supra*, 68 Cal.App.4th at p. 740), defendants also acknowledge common management between the entities. Notably, the two entities shared a single board of trustees. In addition, several individuals testified to their dual officer or managerial roles with both companies, including Morgan as chief financial officer "for all [Montage] companies," Sober as chief nursing officer for CHOMP and Montage, and Smorzewski as the chief human resources officer at CHOMP and Montage at the time of the trial. Several individuals testified

40

that Dr. Cabrales was the vice president of medical affairs for Montage and chief medical officer of CHOMP. The evidence thus supports the trial court's finding that "Montage officers are also acknowledged to be in control of the compliance and nursing operations where [Stiver] presented complaints."

The final two factors of the integrated enterprise test are centralized control and interrelation of operations. Centralized control of a subsidiary's employees by the parent company, deemed by case law to be the most important factor, pertains to the parent's control over " ' "the final decisions regarding employment matters." ' " (*Laird, supra*, 68 Cal.App.4th at p. 738.) Interrelation of operations requires a showing not only "that officers of the subsidiary report to the parent corporation or that the parent benefits from the subsidiary's work," but "that the parent has exercised control 'to a degree that exceeds the control normally exercised by a parent corporation.' " (*Ibid.*) Under both factors, we consider " 'the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties.' " (*St. Myers, supra*, 44 Cal.App.5th at p. 311.)

Defendants argue that the evidence established Montage funds its subsidiaries, ensuring adequate funding to provide patient care, but neither controls staffing of the subsidiaries nor exercises control over the work environment or work performed. They maintain Stiver "presented no evidence that Montage controlled the 'day-to-day' employment decisions of CHOMP."

We disagree. The record, viewed in the manner most advantageous to Stiver, demonstrates substantial control over aspects of Stiver's employment, including his suspension and ultimate termination. In several instances

recounted at trial, Montage officers influenced or made key decisions that affected Stiver's performance of his employment duties.

The evidence supports an inference that Montage vice president and then-chief nursing officer Lowe was closely involved in directing decisions affecting technologists' performance of duties at CHOMP's Tyler Heart Institute, including whether to continue dual call coverage and technologists' role in the operating room. Lowe instructed the Tyler Heart Institute directors on steps to quickly fill Stiver's prior assistant director job and to make his transition to a technologist position appear to be his choice. Furthermore, Sober testified that assigning a director role to Stiver would require a proposal to a Montage officer and approval by the Montage executive committee, supporting an inference that key staffing decisions required the approval (and could be rejected by) Montage officers. These constitute substantial evidence of Montage's control over day-to-day employment decisions of CHOMP.

In addition, substantial evidence at trial showed Montage officers affecting or controlling certain employee operations at CHOMP relative to employee duties for medical procedures. When CHOMP's director of the Tyler Heart Institute implemented a rule restricting technologists, including Stiver, from performing transesophageal echocardiograms in the operating room, doctors in the department contacted Montage's vice president of medical affairs, Dr. Cabrales, to reverse the decision.

Substantial evidence also supports an inference that compliance and human resources issues that arose at CHOMP were subject to Montage's centralized control and oversight. Smorzewski reported compliance issues raised by Stiver and others to Montage vice president and chief compliance officer Nylen, who decided whether the issues risked noncompliance with

state or federal law. Montage's Code of Ethical Conduct directed CHOMP employees to report any workplace or compliance concerns to Montage's compliance department or chief compliance officer.

The evidence pertaining to Stiver's suspension, the conduct of the investigation, and the termination decision also support an inference of control by Montage. There was a substantial blurring of capacities, whereby the employees themselves did not differentiate between their activities on behalf of Montage and/or CHOMP. Gilbert, the assistant director of human resources, variously described her position as with CHOMP and Montage. But in describing the termination decision, Gilbert unambiguously testified that she, Sober, and Smorzewski "were Montage representatives," supporting the inference that they acted in that capacity in deciding to terminate Stiver's position. Gilbert's signature block in her e-mail to department directors informing them of Stiver's suspension, and Smorzewski's signature block in his e-mail communications with Stiver, both referred to "Montage Health," further supporting this inference. The termination decision made by Smorzewski and Gilbert required approval by a Montage officer, which in this case was fulfilled by Sober.

Defendants challenge these inferences. They maintain, citing the common law presumption that dual serving officers and directors " 'are wearing their "subsidiary hats" and not their "parent hats" when acting for the subsidiary' " (*United States v. Bestfoods* (1998) 524 U.S. 51, 69), that the "mere fact that CHOMP employees were also Montage officers is not enough to prove that Montage controlled CHOMP's day-to-day employment decisions." (See *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 548–549.)

43

Defendants argue that Stiver could have attempted to (but did not) supply this evidence by examining witnesses about the capacity in which they served when performing their duties, and that the evidence that Montage created common policies for its subsidiaries, consolidated its financial reporting, or that employees used the parent company's name in internal communications is not, without more, sufficient.

We recognize that certain facts (like common management or consolidated financial reports), standing alone, are insufficient to support an inference that the decision makers who directed and controlled key decisions affecting Stiver's employment did so in their capacity as Montage officers. However, the totality of the above recited facts (*Vernon*, *supra*, 116 Cal.App.4th at p. 124), construed most favorably for Stiver (*Carter*, *supra*, 122 Cal.App.4th at p. 1320), suffice to rebut any presumption that Smorzewski, Gilbert, Sober, and others that held dual positions acted exclusively in their CHOMP capacity. (Cf. *ibid.*) These facts distinguish this appeal from cases relied on by defendants in which courts rejected the allegation of joint employer liability. (See, e.g., *St. Myers*, *supra*, 44 Cal.App.5th at pp. 312–313; *Laird*, *supra*, 68 Cal.App.4th at pp. 739–740.)

We conclude that reasonable inferences drawn from the evidence support a determination that the final word dictating Stiver's day-to-day employment duties and approving his suspension and termination rested with Montage. Under the substantial evidence standard, that certain evidence was contradicted, or that other reasonable inferences could be drawn to reach a contrary conclusion, is insufficient to overturn the trial court's decision. (*San Diego Unified*, *supra*, 214 Cal.App.4th at p. 1142; *Bowers*, *supra*, 150 Cal.App.3d at p. 874.) Assuming proper instruction to the jury on the integrated enterprise test for joint employer liability, we decide

the evidence was sufficient to support a finding of joint employer liability as to Montage.

### 3. Healthcare Whistleblower Claim (Health & Saf. Code, § 1278.5)

Defendants contend the trial court erred on two grounds in imposing liability against Montage under Health and Safety Code section 1278.5. They maintain that (1) Stiver's healthcare whistleblower claim assumed he was Montage's employee despite a lack of substantial evidence to that effect, and (2) Montage is not a " 'health facility' " within the meaning of the statute. Stiver counters that the statute prohibits retaliation against health care workers regardless of their employment status and maintains that Montage not only comes within the definition of health facility but is a facility owner and operator.

Defendants' first claim of error repeats, in part, the argument that there is no substantial evidence to support the jury's verdict and subsequent bench trial finding on Montage's employer liability. We have already rejected this contention, having concluded *ante* that substantial evidence supports the finding of joint employer liability as to Montage (assuming proper instruction to the jury on partial new trial).[11]

Defendants' claim also implicates the meaning of "health facility" under Health and Safety Code section 1278.5, raising a legal issue under the motion for JNOV. "Where, as here, a motion for JNOV raises legal issues, such as the application of law to undisputed facts or the interpretation of a statute,

---

[11] Moreover, even if we were to consider defendants' argument that Stiver was not Montage's employee, the protections of the statute "are not limited to employees." (*St. Myers, supra*, 44 Cal.App.5th at p. 313.) The statute broadly identifies retaliation "against *a patient, employee, member of the medical staff, or other health care worker* of the health facility" (Health & Saf. Code, § 1278.5, subd. (b)(1), italics added) and includes in its scope "[a]n entity that owns or operates a health facility" (*id.*, subd. (b)(2)).

we review the trial court's ruling 'under a de novo standard of review.' "
(*Gonzales v. City of Atwater* (2016) 6 Cal.App.5th 929, 946–947; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  We independently construe the statute, seeking "to ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386 (*Dyna-Med*).)  We "look first to the words of the statute [], giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." (*Id.* at pp. 1386–1387.)

The healthcare whistleblower statute states, "The Legislature finds and declares that it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions." (Health & Saf. Code, § 1278.5, subd. (a).)  The statute prohibits discrimination or retaliation by a "health facility" against any health care worker who reports unsafe patient care and conditions.  (*Id.*, subd. (b)(1).)  It also prohibits discrimination or retaliation by "[a]n entity that owns or operates a health facility, or that owns or operates any other health facility . . . against a person because that person has taken any actions pursuant to this subdivision." (*Id.*, subd. (b)(2).)

The statute further defines a " 'health facility' " for purposes of this section as "a facility defined under this chapter, including, but not limited to, the facility's administrative personnel, employees, boards, and committees of the board, and medical staff." (Health & Saf. Code, § 1278.5, subd. (i).)  The underlying definition is set forth in chapter 2 of division 2 of the Health and Safety Code, which states that " 'health facility' means a facility, place, or building that is organized, maintained, and operated for the diagnosis, care,

46

prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation" (*id.*, § 1250) and specifies several "types" of facilities including, among others, " '[g]eneral acute care hospital' " (*id.*, subd. (a)).

Defendants contend Montage cannot be liable under the healthcare whistleblower statute because it is not a "facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness." (Health & Saf. Code, § 1250.) They assert there is no substantial evidence that Montage employs doctors, nurses, or other health care workers and, "[i]ndeed, it has *no* employees." Defendants contend that inasmuch as Montage is not an employer, it "does not and cannot provide diagnosis, care, or prevention of human illnesses—Montage's subsidiaries do that," while Montage "manages assets, provides funding for its subsidiaries, and recruits physicians." Defendants further cite *St. Myers* as support for distinguishing between a medical facility and a company that provides critical administrative and support services to the health care operation but is not itself a health facility.

We are not persuaded. Defendants' cramped reading of the statute overlooks several key components of Health and Safety Code section 1278.5, including its application not only to a "health facility" (*id.*, subd. (b)(1)) but also to "[a]n entity that owns or operates a health facility, or that owns or operates any other health facility" (*id.*, subd. (b)(2)). Furthermore, the statute expressly provides an expansive definition of " 'health facility,' " specifying that the definition in Health and Safety Code section 1250 includes, and is not limited to, "the facility's administrative personnel, employees, boards, and committees of the board, and medical staff." (*Id.*, § 1278.5, subd. (i).)

47

Even assuming, arguendo, that the facts presented in this record—properly construed in the light most favorable to the verdict (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 769; *Carter*, *supra*, 122 Cal.App.4th at p. 1320)—support the conclusion that Montage is not itself an employer and merely, as defendants assert, "manages assets, provides funding for its subsidiaries, and recruits physicians," that would not be determinative under the statutory definition.

Substantial evidence established that Montage, as the parent company and owner of CHOMP and the other Montage health facilities, exercised considerable control over certain aspects of CHOMP's day-to-day employee operations, including over the termination of Stiver's employment. Applying the ordinary and plain meaning of the statute's language, and giving significance to the statute's expansive definition of " 'health facility' " to include the owner/operator of the facility and administrative personnel, boards, committee of the board, and medical staff and committee personnel of the health facility (*Dyna-Med*, *supra*, 43 Cal.3d at pp. 1386–1387), we reject defendants' contention that Health and Safety Code section 1278.5 applies only to the "facility, place, or building" that is maintained for diagnosis, care, prevention, and treatment.

The comparison defendants draw to *St. Myers* is inapt. In that case, a nurse practitioner sued Dignity Health, the owner of the rural medical center that employed the plaintiff, and Optum360 Services, Inc., a company that provided revenue cycle services to Dignity Health, for healthcare whistleblower retaliation and other claims. (*St. Myers*, *supra*, 44 Cal.App.5th at p. 305.) The services provided by Optum360 to the medical center included scheduling, patient registration, health information management such as coding and transcription, billing, and collections. (*Id*. at p. 306.) The

48

appellate court held that the proper defendant of the plaintiff's whistleblower claim under Health and Safety Code section 1278.5 was Dignity Health, which owned and operated the rural medical center, not Optum360. (*St. Myers*, at pp. 313–314.) The court rejected the plaintiff's argument that Optum360's provision of indispensable services to the medical clinic, such as scheduling, coding, and billing, brought it within the scope of the statute. (*Id*. at p. 314 [reasoning that "a medical clinic needs power and water to operate, but that does not make utility companies 'health facilities' under the statute"].) Montage's role in this case can reasonably be compared to that of Dignity Health, as the owner and operator of the medical center in *St. Myers*, not Optum360, which provided "ancillary services" and "did not operate or manage 'the diagnosis, care, prevention, and treatment of human illness.' " (*Id*. at p. 305.)

In sum, there is substantial evidence that Montage is the owner of CHOMP and the other subsidiary clinics providing care and prevention services, and that human resources and medical personnel—operating in their capacity as Montage officers—exercised control over certain aspects of CHOMP's medical and employee operations for purposes of joint employer liability. We decide the trial court did not err in holding Montage liable under Health and Safety Code section 1278.5.

> 4. <u>Punitive Damages</u>

Defendants contend they are entitled to judgment on Stiver's claim for punitive damages. Defendants do not contest the jury's finding of oppression, fraud, or malice; instead, they assert that Stiver failed to present clear and convincing evidence that any such act was committed or ratified by an officer, director, or managing agent of Montage. In response, Stiver points to the actions taken by Gilbert, Smorzewski, and Sober, with knowledge and

approval of Montage executives, and to what Stiver characterizes as false explanations at trial that further evince malice, oppression, or fraud.

a. Additional Background

The trial court separately instructed the jury regarding punitive damages as to CHOMP and Montage. It explained, beginning with CHOMP, "If you decide that [CHOMP]'s conduct caused Jared Stiver harm, you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue decided later."

The trial court gave an identical instruction as to Montage, setting out the standard of proof ("Stiver must prove one of the following by clear and convincing evidence") and elements for corporate liability ("One, that the conduct constituting malice, oppression, or fraud was committed by one or more officers, directors or managing agents of Montage Health[,] who acted on behalf of Montage Health. [¶] Or, two, the conduct constituting malice, oppression, or fraud, was authorized by one or more officers, directors, or managing agents of Montage Health. [¶] Or, three, that one or more officers, directors, or managing agents of Montage Health knew of the conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred."). The court further instructed the jury on the definitions of malice, oppression, and fraud, and defined the term "managing agent" ("An employee is a managing agent if the person exercises substantial independent authority and judgment in the person's corporate decisionmaking such that the person's decisions, ultimately, determine corporate policy.").

In closing arguments, Stiver's counsel called the reasons put forth by defendants for Stiver's termination "a pretense" and "a fraud" and asked the

50

jury to "[f]ind their conduct malicious, oppressive, or fraudulent. [¶] Sober, Smorzewski, Gilbert, all three, they were all in on it. They all did it."

b. Legal Principles and Standard of Review

We review for substantial evidence the trial court's denial of defendants' motion for JNOV as to the sufficiency of the evidence to support the jury's award of punitive damages (*Carter, supra*, 122 Cal.App.4th at p. 1320; *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1089 (*Morgan*)), bearing in mind the heightened standard of proof required for imposition of punitive damages. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*).)

To obtain punitive damages against a "corporate employer" like Montage, a plaintiff must prove by clear and convincing evidence that the defendant acted with "oppression, fraud, or malice" and that those acts were performed, authorized, or ratified by an "officer, director or managing agent" of the corporation. (Civ. Code, § 3294, subds. (a), (b); *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 554 (*Tilkey*); see *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 721 (*College Hospital*).) Under the statute, " 'oppression,' " " 'fraud,' " and " 'malice' " "involve[] 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injur[ious]' nature." (*College Hospital*, at p. 721; Civ. Code, § 3294, subd. (c).)

The California Supreme Court has explained the standard for imposing punitive damages on a corporate employer as "requiring the officer, director, or managing agent to be someone who 'exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy.' " (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714 (*Roby*); see also *White, supra*, 21 Cal.4th at p. 573.) " '[C]orporate policy' " means "formal policies that affect a substantial portion of the company and that are the type likely to

51

come to the attention of corporate leadership." (*Roby*, at p. 715.) "A company ratifies a managing agent's decision when it knows about and accepts the decision." (*Tilkey*, *supra*, 56 Cal.App.5th at p. 554.)

    c. Analysis

Having carefully reviewed the arguments and evidence cited by both sides and having considered the record as a whole, we conclude there is "substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded" to support the verdict on punitive damages. (*O.B.*, *supra*, 9 Cal.5th at p. 1005.)

As set forth *ante* in our discussion of joint employer liability, substantial evidence supports the jury's determination that Gilbert and Smorzewski were acting in their capacity as representatives of Montage when they suspended, investigated, and terminated Stiver. Although Smorzewski was not yet a Montage executive officer, he was the chief human resources officer of CHOMP, and substantial evidence in the record suggests the human resources department was centralized as a CHOMP/Montage operation.

Gilbert and Smorzewski both had discretion and authority over the suspension and investigation process. Gilbert confirmed that as assistant human resources director, deciding how to perform an investigation is "situational," as the human resources policies do not dictate the process. Smorzewski furthermore had the authority to author, implement, and sign off on personnel policies, including suspension and termination policies, over CHOMP employees.

The evidence also established Sober's role, as an executive officer of Montage, in Stiver's termination. According to Gilbert, Sober provided "final approval" of the termination decision, and the termination report states that

it was "[e]valuated [b]y" Sober. Sober's approval of the termination decision as a Montage representative and executive officer was impactful because she had worked with Stiver as the director of the Tyler Heart Institute, knew his skills and abilities, and was aware of his allegations of retaliation. Notably, Sober extolled Montage's chief nursing officer Lowe in 2018, when Lowe explained to Rusert how they could "stay[] on the CHOMP culture train and keep[] it all successful" once Stiver agreed to resume his former technologist position. Sober wrote to Lowe, "I really like how you explained the CHOMP culture and how this all lines up on how we do things here. . . . I also liked how we manage the situation up for Jared."

Sober's extensive history with Stiver supports an inference that, as the Montage executive tasked with final approval of his termination, she declined to exercise her discretion differently from that of Smorzewski and Gilbert and instead ratified their actions. (See *Roby*, *supra*, 47 Cal.4th at p. 714; *Tilkey*, *supra*, 56 Cal.App.5th at p. 554.) The jury might also have reasonably drawn adverse inferences regarding Sober's credibility and perceived minimization of her role in Stiver's termination, including based on evidence that the independent investigator hired by CHOMP in 2020 (in response to Stiver's retaliation claims) raised doubts as to Sober's credibility. A reasonable jury could have declined to credit Sober's testimony that she was not consulted about the decision to terminate Stiver in light of Gilbert's testimony that Sober "had to give a final approval" and the statement on the termination report that it was "[e]valuated [b]y" Sober.

Substantial circumstantial evidence also supports the inference that the suspension and termination decision was communicated to and approved by other Montage leadership, including Nylen and Dr. Packer. Just weeks before Gilbert informed Stiver and the CHOMP departments of Stiver's

suspension, Sober had suggested to Dr. Packer that an anonymous complaint to the local news media about CHOMP's management and cardiology staff attrition "smell[ed] like Jared." Smorzewski also requested a few minutes of time with Dr. Packer and Nylen to "talk . . . about Stiver" and inform them of the impending suspension and investigation. This evidence, along with Sober's testimony that Nylen told her that Stiver would be terminated shortly before it occurred, supports an inference that Montage managing agents and executive officers were aware of and approved the adverse actions taken against Stiver.

Defendants dispute that the evidence supports a conclusion that any officer, director, or managing agent of Montage committed any malicious or oppressive conduct, or ratified any such acts with knowledge of their malicious nature. They contend the key shortcoming and fundamental problem with the punitive damages award is that the evidence fails to establish that Smorzewski, Gilbert, and Sober had any discretionary authority to determine Montage's corporate policy, as opposed to authority over policies for CHOMP.

With respect to Smorzewski, they assert that, at the time of Stiver's termination, his position as chief human resources officer "was not considered an executive level position." They argue Stiver presented no evidence that Smorzewski had policymaking authority for Montage at that time, since the human resources policies he wrote and/or approved pertained to CHOMP, not Montage. Defendants similarly assert that although Gilbert referred to herself, Smorzewski, and Sober as " 'Montage representative[s],' " there is "no evidence that she held any actual title with Montage, nor any evidence that she had any discretionary authority to develop policies for Montage, rather than CHOMP." As to Sober, defendants maintain that she was not consulted

or involved in the decision to terminate Stiver but was required only "to sign off on the decision afterwards" and there was no evidence that she did so as a representative of Montage.

These arguments construe the evidence in the light most favorable to Montage and thus fail to apply the correct standard on appeal from the denial of a motion for JNOV. The evidence regarding Montage's degree of oversight and control of the decisions that determined Stiver's employment outcome was contradicted. The testimony of the key decision makers implementing the human resources department's response to Stiver presented a convoluted picture of their representative capacities at the time of Stiver's suspension and termination. We do not rely on discrete testimony or isolated evidence but look to the entire record " ' "*in the light most advantageous to the plaintiff.*" ' " (*Carter, supra,* 122 Cal.App.4th at p. 1320, italics added.) Reviewing the totality of the evidence through the lens most beneficial to Stiver and considering only " ' "whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact" ' " (*San Diego Unified, supra,* 214 Cal.App.4th at p. 1142), we are not persuaded that the verdict on punitive damages lacks sufficient evidence.

Defendants' arguments also read too narrowly the term "managing agent[s]" for purposes of punitive damages liability as a corporate employer. (Civ. Code, § 3294, subd. (b).) It is well settled that "[t]he term 'managing agent' includes 'only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy.' [Citation.] '[T]o demonstrate that an employee is a true managing agent . . ., a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's

business.' [Citation.]  But the determination of whether certain employees are managing agents ' "does not necessarily hinge on their 'level' in the corporate hierarchy.  Rather, the critical inquiry is the degree of discretion the employees possess in making decisions." ' " (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 886 (*Powerhouse*).)  "Corporate policy refers to 'the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations.' " (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 713 (*King*).)

Defendants contend Stiver did not solicit testimony about whether CHOMP's human resources personnel were authorized to make discretionary policy for Montage.  However, that is precisely what the totality of the evidence demonstrates.  Gilbert and Smorzewski each acknowledged that they held considerable discretion to implement personnel policies and conduct investigations impacting CHOMP employees (like Stiver) and did so— expressly or impliedly—as Montage representatives.  The authority to determine the corporate response to an employee's allegations of retaliation and direct the investigation into coworker complaints about an employee represents " 'substantial discretionary authority over significant aspects of a corporation's business.' " (*Powerhouse, supra*, 221 Cal.App.4th at p. 886.)

Defendants seek to distinguish the degree of discretion held by Gilbert and Smorzewski from cases affirming punitive liability based on the conduct of a supervisor or employee exercising authority as a managing agent.  We are not persuaded.  In *King*, a human resources generalist who investigated employee claims of discrimination and harassment against the plaintiff—who was ultimately fired as a result—did so without policies, rules, or procedures guiding the investigation.  (*King, supra*, 53 Cal.App.5th at pp. 683–684.)  The

56

appellate court held that "[g]iven the breadth of the discretion delegated to [the human resources generalist] in determining how to fairly and thoroughly investigate suspected acts of dishonesty or unethical misconduct (i.e., a corporate policy) . . . – the results of which would determine (and in this case did determine) whether an employee would be disciplined or terminated – the jury could have reasonably inferred she had the authority and discretion to interpret and apply the investigative policies for U.S. Bank's commercial banking division as she saw fit, such that her decisions ultimately determined corporate policy." (*Id*. at pp. 713–714.)

The same is true in this case. Contrary to defendants' assertion that there "was no evidence whatsoever about any discretionary authority that Montage gave anyone, and therefore no basis for a jury to conclude that anyone involved in Stiver's termination was a Montage policymaker," ample evidence suggested that Montage executive officers, including Nylen, Dr. Packer, and Sober, were informed of Stiver's suspension and of Gilbert's and Smorzewski's conduct of an investigation, the implementation of which was entirely within their discretion, and ultimately ratified the CHOMP human resources officers' determination of corporate policy. This evidence is more than adequate to support the jury's verdict. (See, e.g., *White, supra,* 21 Cal.4th at p. 577; *Powerhouse, supra,* 221 Cal.App.4th at p. 886.)

As the trial court found in its discussion of Montage's joint employer liability under the integrated enterprise theory, even though neither Gilbert nor Smorzewski served as executive level employees at the time of Stiver's termination, both acted as managing agents for Montage given the scope of their duties, their discretionary authority implementing employment policies, and their role in the investigation into and termination of Stiver. It is true that CHOMP's written personnel policies (including "Expectations of

57

Employee," "Disciplinary Action," and "Termination") stated they applied to "[a]ll CHOMP departments," and did not specifically reference Montage. However, the evidence as a whole suggested that CHOMP's human resources personnel had broad discretion to implement these policies and were authorized by Montage to do so, as shown by Smorzewski's reporting to Nylen and Nylen's express or implied approval of the processes used against Stiver. Moreover, the policies that governed compliance issues—including Stiver's reporting of billing or patient care concerns—were Montage policies that applied to all employees, officers, and boards of trustees of the Montage organization.

We further agree with the trial court that substantial evidence supports the jury's findings that Stiver was wrongfully discharged from CHOMP—the retaliatory result of his "real and substantial complaints" about billing problems and patient care. The jury's verdict further demonstrated that the jury did not credit defendants' attempt to demonstrate a legitimate or independent basis for Stiver's termination based on his purported bullying and negative attitude at work. The totality of the evidence supports the jury's conclusion—upheld by the trial court in denying the motion for JNOV—that there was clear and convincing evidence of " 'intentional,' 'willful,' or 'conscious' wrongdoing" (*College Hospital*, *supra*, 8 Cal.4th at p. 721) by Montage's officers and managing agents who had knowledge of and approved the actions taken against Stiver, up to and including his suspension, investigation, and termination.

We conclude the trial court did not err in concluding that "clear and convincing evidence could support a finding of malice based on a retaliatory discharge for whistleblowing activity by an employee who had become a thorn in the side of Montage."

58

5. Evidentiary Errors

Defendants contend that Montage is entitled to a new trial on liability because of prejudicial evidentiary errors. Defendants maintain that the trial court committed prejudicial error by (1) excluding contemporaneous notes from the investigation that led to Stiver's termination, and (2) admitting evidence of Stiver's complaint about CHOMP's underbilling of "trunk stock" devices received from medical device companies. Stiver counters that Montage cannot meet its burden on appeal to prove the alleged evidentiary errors resulted in a miscarriage of justice or that any evidentiary error occurred.

a. Additional Background

Defendants argued at trial that Stiver was terminated for legitimate reasons based on Gilbert's and Smorzewski's investigation into complaints by Stiver's coworkers of abusive and bullying conduct, manipulating schedules, and creating a toxic workplace environment. Stiver's counsel sought to undercut this defense by eliciting evidence that the termination notice did not accurately reflect statements made by the alleged complainants. Stiver's counsel objected on hearsay grounds to defense counsel's request to publish Gilbert's and Smorzewski's interview notes to the jury. Defense counsel responded that the notes were admissible not for the truth of the coworker complainants' statements but to establish Gilbert's and Smorzewski's states of mind.

The trial court ultimately admitted only the notes from interviews of those witnesses who testified at trial. The court rejected defendants' assertion that exclusion of the other notes was prejudicial because it would allow Stiver's counsel to suggest to the jury that Gilbert and Smorzewski

59

simply "made . . . up" those statements in the termination notice not found in the interview notes.

As for the "trunk stock" issue, defendants moved in limine to exclude evidence of the trunk stock underbilling issue. They argued that Stiver's reporting of billing issues related to trunk stock could not be the basis of a claim for wrongful termination in violation of public policy because such a claim (referred to as a *Tameny* action)[12] must be based on violation of a fundamental public policy expressed in a statute or a constitutional provision. (See *Jennings v. Marralle* (1994) 8 Cal.4th 121, 130.) According to defendants, Stiver's report of trunk stock billing violations pertained only to underbilling affecting the hospital and did not support a statutory claim for whistleblower retaliation on an issue that would inure to the public benefit.

The trial court deferred ruling on defendants' motion. During Stiver's testimony, defendants renewed their objection, and the trial court held that it would allow testimony on the trunk stock issue, subject to the court's discretion under Evidence Code section 352 to limit the time spent on the underbilling issue. The court reasoned that the testimony on the trunk stock issue could be construed as relating to the "reporting of issues, . . . 'relating to the care, services, and conditions of a facility' " under the health care whistleblower statute.

The trial court permitted Stiver to testify that he had two concerns related to the trunk stock billing issue: first, that the hospital was losing money, and second, that there was no system tracking the devices being implanted in patients' bodies. Counsel for Stiver also examined Sober about the issue, who contradicted Stiver by asserting that what happened in the

---

[12] *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.

procedure was documented in the medical records.  Both parties referred to the evidence in closing arguments.

### b.  Legal Principles and Standard of Review

We review a trial court's ruling on the admissibility of evidence under the abuse of discretion standard.  (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)  " 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 919.)

Furthermore, "[a] judgment of the trial court may not be reversed for the erroneous admission or exclusion of evidence unless the error was prejudicial, resulting in a miscarriage of justice."  (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 185 (*Ajaxo*); Cal. Const., art. VI, § 13; Evid. Code, §§ 353, 354.)  Under this standard for state law error, reversal is not warranted " 'unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.' "  (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1073 (*Christopher L.*).)  Reasonable probability in this context "does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*."  (*College Hospital*, *supra*, 8 Cal.4th at p. 715.)

### c.  Analysis

The jury's unanimous verdict against Montage represented a thorough refutation of defendants' contention that they had a legitimate and independent reason for Stiver's termination.  As the trial court observed in its ruling denying defendants' motion for JNOV as to punitive damages, the jury found that Stiver "was wrongfully discharged for his complaints or reports

about compliance issues, billing problems and reports affecting patient care. These were real and substantial complaints that were supported by [p]laintiff's testimony and trial exhibits.  On top of this was the investigation into [p]laintiff's alleged bullying behavior and negative attitude at work that the jury did not credit as presenting a legitimate or independent reason for the termination."  The trial court further noted that "[t]he speed with which jurors returned their verdicts, both initially and on [p]hase 2[,] supports an inference that jurors made adverse credibility determinations as to [d]efendants' witnesses."

We agree with the trial court's recitation.  Given the substantial evidence supporting the verdicts, it is defendants' burden to demonstrate prejudicial error resulting in a miscarriage of justice, whereby a result more favorable to the appealing party might have been reached in the absence of the error.  (*Christopher L.*, *supra*, 12 Cal.5th at p. 1073; *College Hospital*, *supra*, 8 Cal.4th at p. 715.)  Even assuming arguendo that the trial court erred by admitting Stiver's testimony regarding his report of trunk stock underbilling and by excluding the investigation notes for nontestifying coworker complainants of Stiver, defendants have not demonstrated a reasonable probability that absent either evidentiary error, a result more favorable to Montage would have been reached.  (*Christopher L.*, at p. 1073.)

With respect to the excluded interview notes, defendants argue that without the notes, it was "much easier for Stiver to convince the jury that CHOMP's termination notice was pretextual."  They assert that Stiver's counsel took advantage of the trial court's error in closing argument by asking the jury to consider whether everything listed in the termination notice was supported by the notes from the interview with complainant

62

Monica Gomez and by pointing the jury to three of the complaints and asking whether they warranted immediate termination.

Considering the entirety of the trial record and Stiver's closing argument, we are not persuaded that giving the jury access to the remaining interview notes would have supplied "a reasonable chance" beyond "an abstract possibility" (*College Hospital*, *supra*, 8 Cal.4th at p. 715, italics omitted) of a better verdict for Montage.  (See *Soule*, *supra*, 8 Cal.4th at p. 580 ["Actual prejudice must be assessed in the context of the individual trial record."].)

Although the trial court excluded the interview notes of those complainants who did not testify at trial, the court permitted Gilbert to testify (over plaintiff's objections) about the complaints received and content of the notes, not limited to those from interviews with testifying witnesses, and to refresh her recollection using the notes themselves.  Defendants thus had the opportunity to introduce any relevant testimony describing complaints that had been received to counter Stiver's argument that the investigation report was not an honest reflection of those complaints.

Furthermore, Stiver relied on a compilation of material to support the inference of pretext, including the timing of the complaints that were submitted, who was interviewed, belated production by defendants of certain interview notes (which Stiver's counsel argued discredited the honesty of the process), and the human resources officers' decision to proceed directly to termination over progressive discipline.  Those portions of Stiver's closing argument cited by defendants represent a de minimis slice of the extensive narrative intended to discredit the entire investigation process as dishonest and unfair and highlighted a range of problematic evidence related to Smorzewski's and Gilbert's documentation.

63

Given the breadth of conduct that Stiver highlighted for the jury as evidence of retaliation and warranting punitive liability, defendants have not demonstrated how the jury's access to interview notes for complainants who did not appear at trial might have altered its verdict as to Montage's liability. Defendants have not specifically identified information the omitted notes would have provided either to fill a perceived gap in the termination notice or to dispel the inference of wrongdoing. We conclude any error in the trial court's omission of the interview notes was harmless.

So, too, defendants have not shown that the trial court erred by permitting testimony about the trunk stock billing issue, nor that any error amounted to a miscarriage of justice warranting a new trial. "The trial court is vested with broad discretion in ruling on the admissibility of evidence." (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 121.) The trial court heard argument at several junctures about the relevance of the underbilling complaint and whether reported billing issues overlapped with or implicated patient health and safety issues. Defendants disagree with the court's conclusion (expressed during the bench trial) "that the billing issues were closely intertwined with health and safety concerns" but have not shown how the court's decision to admit limited testimony on the issue " ' " 'exceeded the bounds of reason' " ' " and constituted an abuse of discretion. (*Jordan R.*, at p. 121.)

Defendants assert the trunk stock issue was "a significant distraction" from the merits of Stiver's retaliation claim and misled the jury because it "superficially supported" Stiver's narrative that he was a whistleblower. However, the trunk stock billing issue was only one of several issues raised by Stiver during his tenure at CHOMP, several of which had direct relevance to patient care. Examples include Stiver communicating with Sober in early

64

2018 about the physician whose work in the catheterization laboratory was resulting in higher complication rates, informing Montage's chief compliance officer in 2020 that he discovered another billing issue related to patient care, and reporting to management in 2021 that Tyler Heart Institute staff were not following procedure protocol. Any erroneous admission of testimony related to trunk stock underbilling was counteracted by other complaints related to procedure protocols and recurring patient care problems.

Furthermore, though litigated extensively outside the jury's presence, the trunk stock issue was not the focal point in Stiver's case. Stiver's counsel cited it only once in closing argument in the context of asserting that Stiver discovered issues in the catheterization laboratory and brought them to the attention of his supervisor before being removed and denied consideration for the position he sought.

By contrast, defense counsel cited the "trunk stock" issue three times in closing argument. Counsel argued that, contrary to Stiver's narrative of retaliation, other employees who reported problems (including the trunk stock issue) were not fired or blamed and cited the date of Stiver's complaint to show that he was named interim assistant director of the catheterization laboratory only five days after he raised the trunk stock underbilling issue. Defense counsel also argued that Stiver's alleged whistleblowing was not based on a reasonable belief that the disclosure was a violation of law because Stiver "knew [] the trunk stock issue wasn't overbilling" and a record of the devices was in the purchase orders.

We conclude that given the overall strength of Stiver's case and breadth of evidence presented to the jury, any error in admitting limited testimony and evidence about the trunk stock issue was not prejudicial.

*C. Stiver's Cross-Appeal*

In his cross-appeal, Stiver challenges on procedural and substantive grounds the trial court's order partially granting a new trial (hereafter new trial order or order). Procedurally, Stiver contends the order fails to comply with the statutory bases authorizing the grant of a new trial. Substantively, Stiver maintains there was no instructional error on the issue of Montage's employer liability and, to the extent error occurred, it was not prejudicial. Stiver does not challenge the jury's findings as to CHOMP, including the award of only noneconomic damages and the jury's determination that CHOMP did not act with malice, oppression, or fraud to support an award of punitive damages.

1. Additional Background

In its motion for new trial, described *ante* (pt. I.F.), Montage asserted "error in law" under Code of Civil Procedure section 657 as one of the bases for a new trial. Montage contended that the trial court's omission of a jury instruction on the relationship between Montage and CHOMP was prejudicial error. (See *Soule, supra*, 8 Cal.4th at pp. 580–581; *Defries v. Yamaha Motor Corp.* (2022) 84 Cal.App.5th 846, 863 (*Defries*).)

After a hearing on the posttrial motions, the trial court issued written orders denying Montage's motion for JNOV "subject to further proceedings on the motion for new trial" and granting in part Montage's motion for new trial. The court determined that the failure to instruct on the plaintiff's theory that Montage was his employer "under an 'integrated enterprise' or similar joint liability or alter ego theory" was legal error. It further explained that given the conflicting state of the evidence at trial on the employment relationship, it could not say with certainty that the failure to instruct on the relevant

66

legal theory or theories was not prejudicial. The court ordered a limited retrial.

The trial court stated that its grant of a partial new trial sought "to respect and preserve as much of the jury's verdict that is untainted by the instructional error." It noted that in arriving at its decision, it "made certain credibility findings regarding the evidence," including that "[s]ubstantial credible evidence" supported a finding that Stiver was discharged without good cause and was wrongfully discharged for his complaints about billing and care, and that defendants' witnesses, namely Smorzewski and Gilbert, had poor recollection of key events and appeared "very defensive explaining what happened and did not persuasively explain the basis for the discharge, especially given [p]laintiff's skill and tenure on the job."

Based on its adverse credibility and factual findings as to Montage and determination that the instructional omission was prejudicial, the trial court limited the new trial to the issues of (1) whether Stiver was employed by or in an employment relationship with Montage, and (2) the amount of Stiver's compensatory and punitive damages, if any, leaving undisturbed the award of noneconomic damages against CHOMP. More specifically, the court explained that if a second jury confirms Montage was in an employment relationship with Stiver, the court—given its "independent review of the evidence and assessment of the credibility of witnesses"—will confirm the first jury's award of punitive damages against Montage.[13]

The trial court denied Montage's motion for new trial on all other asserted grounds.

---

[13] In the order, the trial court made additional remarks with respect to CHOMP that defendants do not challenge in their appeal and Stiver does not address in his cross-appeal. (See fn. 16, *post*.)

## 2. Legal Principles and Standard of Review

Under Code of Civil Procedure section 657, a new trial may be granted "on all or part of the issues" for any of seven specified grounds "materially affecting the substantial rights of [the aggrieved] party." The seventh ground is: "Error in law." (*Ibid*.) The statute also requires the trial court, upon granting a new trial, to "specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." (*Ibid*.)

The parties dispute the applicable standard of review.

Stiver asserts, citing *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 (*Aguilar*), that the grant of a new trial based on an error of law (such as instructional error) is reviewed de novo. He maintains that an order that fails to specify the statutory grounds for a new trial is, likewise, reviewed de novo. (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 639–640 (*Oakland Raiders*).) Citing *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 (*Jiminez*), defendants counter that the trial court's decision to grant a new trial is entitled to great deference and is reversible only for abuse of discretion. (See also *Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 411–412 (*Lane*).)

Ordinarily, an order granting a new trial is reviewed for abuse of discretion. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 628.) As stated in *Jiminez*, "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for

68

the order granting the new trial, the order will not be set aside." (*Jiminez*, *supra*, 4 Cal.3d at p. 387; see also *Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747.) Thus, "a trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872.)

Notwithstanding this general standard, there are at least two circumstances in which a reviewing court applies its independent review to an order granting a motion for new trial.

One such circumstance, discussed in *Oakland Raiders*, arises when the trial court fails to supply a statement of reasons as required by Code of Civil Procedure section 657. There, the trial court had specified jury misconduct as the ground for granting the new trial motion but did not state its reasons for granting a new trial on that ground. (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 635.) The California Supreme Court held "the absence of a statement of reasons calls for independent review of the trial court's order granting a motion for a new trial." (*Id*. at p. 640.) It explained that when the trial court provides a statement of reasons, "the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion. [Citations.] But when there is no statement of reasons, an appellate court's use of an abuse of discretion standard of review would subvert the purposes that this court has identified as underlying [Code of Civil Procedure] section 657's statement of reasons requirement." (*Id*. at p. 636.)

The second circumstance requiring independent review of the order granting new trial arises when the "sole determination underlying" the order granting new trial is itself a question of law. (*Aguilar*, *supra*, 25 Cal.4th at p. 860.) In *Aguilar*, the trial court granted a new trial following its order

69

granting the defendants' motion for summary judgment. (*Id*. at p. 859.) Since an order on summary judgment is subject to the court's independent review, the California Supreme Court agreed with the appellate court's application of independent review to the order granting a new trial. (*Ibid*.)

The court in *Oakland Raiders* clarified these approaches by reviewing several prior California Supreme Court decisions. It explained that "in reviewing an order granting a new trial, the appellate court will independently review an issue of law [citations] but will defer to the trial court's judgment on the issue of prejudice because that issue involves an assessment based on the entire record of the proceedings before the trial court, and it is thus more suitably made by the trial court. (*Oakland Raiders*, *supra*, 41 Cal.4th at pp. 639–640.)

That is the standard we shall apply here. In reviewing the new trial order, we independently review any issues of law (such as instructional error) but defer to the trial court's resolution of conflicts in the evidence and judgment on the issue of prejudice. (*See Oakland Raiders*, *supra*, 41 Cal.4th at pp. 639–640.) To the extent Stiver maintains that the trial court's order fails to specify a statutory ground or statement of reasons, we independently review the order for statutory compliance. (*Id*. at p. 640.)

As to the alleged instructional error, "[a] judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)" (*Soule, supra*, 8 Cal.4th at p. 580.)

"Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule, supra*, 8 Cal.4th at p. 580.) To assess prejudice, the reviewing court looks to the

"individual trial record" (*ibid*.) and considers "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580–581.) In so doing, the court " ' "assume[s] that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party." ' " (*Defries*, *supra*, 84 Cal.App.5th at p. 863; accord, *Mayes v. Bryan* (2006) 139 Cal.App.4th 1075, 1087 ["[T]o assess the instruction's prejudicial impact, we assume the jury might have believed appellant's evidence and, if properly instructed, might have decided in appellant's favor"]; *Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 341.)

### 3. Analysis

Stiver contends the new trial order fails to comply with the requirements of Code of Civil Procedure section 657. He asserts that the order does not specify the statutory ground, does not reflect any prejudicial error resulting in a miscarriage of justice, and is inconsistent with the trial court's denial of Montage's motion for JNOV.

We disagree. Under Code of Civil Procedure section 657, upon granting a new trial, the court must "specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." According to the California Supreme Court, "[t]he word 'ground' refers to any of the seven grounds listed in [Code of Civil Procedure] section 657." (*Oakland Raiders*, *supra*, 41 Cal.4th at p. 634.) Whereas "[a] statement of grounds that reasonably approximates the statutory language is sufficient" (*ibid*.), the statement of reasons "should be specific enough to facilitate appellate review and avoid any need for the appellate court to rely

71

on inference or speculation." (*Ibid.*)

The order states that Montage's motion is granted "on the grounds of error in the law occurring at the trial, specifically the failure to give an instruction on [p]laintiff's theory that Montage was an employer of plaintiff under an 'integrated enterprise' or similar joint liability or alter ego theory." This statement fulfills the statement of grounds requirement by citing the seventh ground listed in the statute, "[e]rror in law." (Code Civ. Proc., § 657; *Oakland Raiders*, *supra*, 41 Cal.4th at p. 634.) The order also sets forth the trial court's detailed reasons for partially granting a new trial based on the instructional omission, further satisfying the strict statutory requirements. Stiver's contention to the contrary is without merit.

Turning to the question of prejudicial error, Stiver raises two objections to the order. He contends that no instructional error occurred and that any error was not prejudicial and does not warrant a new trial.

As to instructional error, Stiver asserts the jury was properly instructed on Stiver's burden to prove that Montage was also his employer. Stiver argues this was consistent with defendants' position at trial that "Montage and CHOMP are two separate entities, not one entity" requiring separate instructions and warranting a multiple defendant instruction. He contends that under *Martinez*, *supra*, 49 Cal.4th 35, the law allows Montage to be held directly liable as Stiver's employer regardless of CHOMP. He maintains the parent-subsidiary relationship was irrelevant because Montage is responsible for its own misconduct under a direct liability theory.

We have already considered these arguments in our analysis of defendants' appeal, *ante* (pts. II.A, II.B.1.). Although we rejected defendants' claim that Stiver's failure to propose a complete and comprehensive integrated enterprise jury instruction forfeited his right to recover on his

72

liability claims against Montage, we agreed with defendants that the trial court erred by omitting a special instruction on joint employer liability based on the integrated enterprise theory.[14]

We next consider whether the error was prejudicial. In its new trial order, the trial court found that, given the conflicting state of the evidence at trial on Montage's relationship with CHOMP and purported employment relationship with Stiver, it could not say with certainty that the failure to instruct on the plaintiff's relevant legal theory or theories "under an 'integrated enterprise' or similar joint liability or alter ego theory" was not prejudicial. Having carefully reviewed the entire record of the trial, we conclude the court did not abuse its discretion in so doing. (See *Oakland Raiders*, *supra*, 41 Cal.4th at pp. 639–640.)

Stiver asserts that "[u]ndisputed admissions" established that CHOMP and Montage were each an employer and that Montage "admitted to being an employer who exercised direct control over Stiver's employment." He maintains the trial court failed to recognize these admissions in its partial new trial order and erroneously accepted Montage's unsupported argument that it was merely a " 'holding company' " or that its officers were wearing their subsidiary "hats" when they acted against Stiver. He emphasizes the jury was not misled, given its unanimous verdicts finding Montage liable as an employer with respect to all claims at trial and the fact that it did not ask questions about the instructions or request a readback of any testimony on

_____

[14] Stiver's argument that the trial court denied Stiver's later-proposed special instruction on integrated enterprise liability because it found the special instruction "unnecessary" mischaracterizes the record. The trial court never made a substantive finding on the proposed special instruction because it struck and deemed the instructions "withdrawn" and "unnecessary" in light of the impending stipulation to dismiss Montage, and neither party asked to revisit the issue after the stipulation for dismissal failed to materialize.

the employment issue. He also contends the asserted prejudice and resulting new trial order are inconsistent with the court's denial of the motion for JNOV.

Stiver's disagreement with the trial court's evaluation of the evidence and the effect of counsel's arguments does not establish an abuse of discretion. In considering whether the instructional omission was prejudicial, we assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated. (*Defries*, *supra*, 84 Cal.App.5th at p. 863.) Stiver's arguments asserting that Montage effectively admitted it employed him construe the disputed evidence in a light adverse to Montage, contrary to this standard. Moreover, we defer to the court's judgment on the issue of prejudice based on its evaluation of the entire record of the proceedings. (*Oakland Raiders*, *supra*, 41 Cal.4th at pp. 639–640.) The court recognized that the state of the evidence was "conflicting" on the issue of the employment relationship between Montage and Stiver. Substantial evidence in the record amply supports the court's assessment.

The arguments of counsel further highlighted this conflict. In closing arguments, Stiver's counsel asserted there was an "employment relationship" between Stiver and Montage (as well as between Stiver and CHOMP), citing among other factors "[c]ommon management," "[c]ommon control over the employees," and "Montage human resources," while defendants' closing claimed "[t]here's not one bit of evidence that showed Montage employed him." Stiver's counsel additionally made generalized arguments for joint liability untethered to any legal standard.

The disputed state of the evidence presented on the question of Montage's employer status, the absence of instruction on how the jury should

make that determination, and the arguments of counsel providing competing narratives about Montage' employer status (with no reference to legal principles governing parent company employer liability), all support the trial court's determination of prejudice. (See *Soule*, *supra*, 8 Cal.4th at pp. 580–581 [listing factors].)[15]

We further reject Stiver's contention that the trial court's evaluation of prejudice and tailored order partially granting a new trial is inconsistent with the denial of Montage's motion for JNOV. The motion for JNOV tested the sufficiency of the evidence, contradicted or uncontradicted, supporting the jury's conclusion of liability. (*Cabral*, *supra*, 51 Cal.4th at p. 770.) The court's resolution of that motion rested in part on its independent review of the record required for its decision on the motion for new trial (*Lane*, *supra*, 22 Cal.4th at p. 412) and its determination of instructional error prejudicial to Montage. Given the distinct standards guiding the court's resolution of each motion, the results (a finding of substantial evidence supporting the verdict on the motion for JNOV, assuming proper instruction on the underlying issue of employer liability, and a finding of prejudicial instructional error on that underlying issue in the motion for new trial) are

---

[15] Stiver asserts several additional arguments in his reply brief in support of the cross-appeal. Among these, he asserts that a miscarriage of justice results from the new trial order, which harms Stiver by "ordering [him] to undertake the additional burden of proving Montage vicariously liable after having already proven Montage directly liable," that substantial evidence supports the judgment against Montage (including punitive damages), and that Montage is foreclosed from challenging the judgment because it invited instructions and verdicts on direct liability, then "took a contrary approach" after the jury returned verdicts against it and argued the jury should have been instructed on a vicarious liability theory. To the extent these arguments are being raised for the first time in Stiver's reply brief and are not already addressed in our analysis, we decline to consider them. (*Ajaxo*, *supra*, 48 Cal.App.5th at p. 194.)

compatible. Further, "[t]he power of a trial court to grant a new trial as to some issues, while refusing it as to others, is also well established." (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285.)

We reject Stiver's contention that the trial court abused its discretion, or committed legal error, in granting a new trial on limited issues. As Stiver does not otherwise challenge the order with respect to the trial court's delineation of which issues may be retried and how the partial new trial will proceed, we affirm the trial court's partial new trial order.[16]

*D. Conclusion*

Having considered the relevant legal authorities on joint employer and parent company liability, we conclude it was Stiver's burden to propose complete and comprehensive jury instructions on the integrated enterprise or a related theory of joint employer liability as to Montage. We disagree with Stiver that the jury instructions given to the jury stating a so-called "direct" theory of liability adequately provided the jury with the relevant factors to decide that Montage was also Stiver's employer.

We also decide that Stiver's failure to request (or, more accurately, re-request) a comprehensive jury instruction for the determination of parent company liability does not forfeit his right to recover on his claims against Montage. Assuming appropriate instruction to the jury on retrial, there is

---

[16] The additional arguments raised by defendants in their respondent's brief to the cross-appeal regarding the scope of the new trial order as it relates to the judgment against CHOMP are not properly before this court. In their appeal, defendants expressly limited the issues raised on appeal to the judgment against Montage. To the extent the trial court's order purports to consider the possibility of a new trial on compensatory and possible punitive damages as to CHOMP, we express no opinion on the merits of that issue.

76

substantial evidence in the record to support a determination of liability as to Montage under the integrated enterprise joint employer theory of liability. There is also substantial evidence to support the trial court's determination of Montage's liability as a healthcare facility and Stiver's joint employer for purposes of Stiver's healthcare whistleblower retaliation claim under Health and Safety Code section 1278.5.

We further decide, upon considering the totality of the evidence and drawing all reasonable inferences in favor of the jury's verdict, that there is substantial evidence in the record to support the finding of punitive liability as to Montage under the heightened clear and convincing evidence standard. Substantial evidence supports the jury's finding that an agent or employee of Montage engaged in adverse employment actions with malice, oppression, or fraud and one or more officers, directors, or managing agents ratified the conduct. We also conclude that the trial court's evidentiary rulings related to the exclusion of certain investigation notes and the admission of testimony on the "trunk stock" billing issue were not an abuse of discretion and, to the extent the court erred, it was not prejudicial considering the totality of the evidence supporting the jury's verdict.

As to the cross-appeal, we conclude that Stiver has not established reversible error. The trial court's order granting in part Montage's motion for new trial appropriately specifies the statutory ground for granting the motion and applies the law regarding instructional error on all major issues raised by the evidence. We perceive no error in the court's carefully reasoned order partially granting Montage's motion for new trial with respect to the judgment against it. We do not reach any issues in the court's order as to CHOMP.

For these reasons, we affirm the trial court's posttrial orders denying Montage's motion for JNOV and granting in part Montage's motion for new trial. Upon affirming these orders and having determined that Stiver has not shown reversible error as to the cross-appeal, we dismiss defendants' "protective cross-appeal" from the judgment.

## III. DISPOSITION

The October 16, 2023 orders denying Montage's motion for judgment notwithstanding the verdict ("order after submission ruling on Montage Health's motion for judgment notwithstanding the verdict (JNOV)") and granting in part Montage's motion for new trial ("order after submission: ruling on Montage Health's motion for new trial") are affirmed.

The appeal from the judgment is dismissed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

_____
                                        Danner, J.


WE CONCUR:




_____
Greenwood, P. J.




_____
Bromberg, J.




**H051653, H051855**
***Stiver v. Community Hospital of the Monterey Peninsula et al.***